ST. PAUL & CHICAGO RAILWAY COMPANY *vs.* CHARLES T. BROWN and others

April 14, 1877.

Exemption of Governor from Control of Courts.—The exemption of the governor of the state from actions or proceedings to enforce the performance of duties devolved on him as executive, rests in the constitution, and cannot be waived by any legislative act.

Trustees of Hospital for Insane may be Sued, when.—The trustees of the Minnesota Hospital for Insane are mere administrative agents of the state, and are not exempt from the control of the judiciary. An action against them to determine the title to lands of the state, held by them, may, with the consent of the state, be brought.

**Same—Consent of State, how given.**—The consent of the state to the bringing of such an action may be expressed by a joint resolution of the two branches of the legislature, passed and approved in the manner prescribed in section 12, article 4 of the constitution, and need not be by bill.

**Same—State Auditor not a Necessary Party, when.**—In an action against the trustees of the hospital for insane to determine the right to lands set apart to that institution by the state, and certified to them by the auditor, the auditor is not a necessary party defendant. In determining the right to such lands, the court may pass the title by its judgment, although it could not enforce a conveyance by the governor.

**Construction of Act of March 6, 1863, Granting Swamp-Lands to the St. Paul & Pacific R. Co.**—The act of March 6, 1863, entitled "An act granting land to aid the Saint Paul and Pacific Railroad Company in the construction of their branch railroad from St. Paul to Winona," whether it be construed as a present grant of lands, or as an executory promise to convey on conditions stated, was, the company having complied with the conditions, a valid contract, and entitled the company to select, in order to make up deficiencies of swamp-lands within the prescribed limits, from any such lands belonging to the state at the time the right to select became perfect.

**Construction of Act of February 13, 1865, setting apart Swamp-Lands to State Institutions.**—The lands set apart by the commissioner of the state land-office to the purposes named in the act of February 13, 1865, entitled "An act to appropriate swamp-lands to certain educational and charitable institutions therein named, and for the purpose of erecting a state prison," could only be lawfully set apart by him from the surplus of such lands after there were enough to fill grants of such lands by the state made prior to the passage of that act.

**Same—Such lands belong to State—Rights of St. Paul & Chicago Ry. Co.**—The swamp-lands so set apart to the trustees of the hospital for insane belong to the state, the title being held by the trustees for it, and as its officers or agents, and, there not being enough swamp-lands without them to fill the grant to the Saint Paul and Pacific Railroad Company, are subject to the right of selection by the plaintiff, the successor in interest of that company, to make up the deficiencies of swamp-lands within the limits prescribed in the act of March 6, 1863.

**Act of March 6, 1863—Extent of grant.**—The act of March 6, 1863, is a grant of seven, and not fourteen full sections per mile

By an act of congress, approved September 28, 1850, (9 St. at Large, 519,) it is provided:

"That to enable the state of Arkansas to construct the necessary levees and drains to reclaim the swamp and over-flowed lands therein, the whole of those swamp and over-flowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be and the same are hereby granted to said state.

"Sec. 2. That it shall be the duty of the secretary of the interior, as soon as may be practicable after the passage of this act, to make out an accurate list and plats of the lands described as aforesaid, and transmit the same to the governor of the state of Arkansas, and, at the request of said governor, cause a patent to be issued to the state therefor; and on that patent, the fee simple of said lands shall vest in the said state of Arkansas, subject to the disposal of the legislature thereof: *provided*, however, that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains aforesaid.

"Sec. 3. That in making out a list and plats of the land aforesaid, all legal subdivisions, the greater part of which is wet and unfit for cultivation, shall be included in said list and plats; but when the greater part of a subdivision is not of that character, the whole of it shall be excluded therefrom.

"Sec. 4. That the provisions of this act be extended to, and their benefits be conferred upon, each of the other states of the union in which such swamp and overflowed lands, known and designated as aforesaid, may be situated."

By a subsequent act, approved March 12, 1860, (12 St. at Large, 3,) it is enacted:

"That the provisions of the act of congress entitled 'An act to enable the state of Arkansas and other states to reclaim the swamp-lands within their limits,' approved September 28, 1850, be, and the same are hereby extended to the states of Minnesota and Oregon: *provided*, that the grant hereby made shall not include any lands which the government of the United

States may have reserved, sold or disposed of (in pursuance of any law heretofore enacted) prior to the confirmation of title to be made under the authority of the said act.

"Sec. 2. That the selection to be made from lands already surveyed in each of the states, including Minnesota and Oregon, under the authority of the act aforesaid, and of the act to aid the state of Louisiana in draining the swamp-lands therein, approved March 2, 1849, shall be made within two years from the adjournment of the legislature of each state, at its next session after the date of this act; and as to all lands hereafter to be surveyed, within two years from such adjournment at the next session after notice by the secretary of the interior to the governor of the state that the surveys have been completed and confirmed."

The Minnesota Hospital for Insane was established by Laws 1866, c. 6, (See Gen. St. 1878, c. 35, tit. 3,) and placed in charge of a board of trustees created by that act, the appointment of the trustees being vested in the governor of the state, with the advice and consent of the senate, their term of office being fixed at six years, and the board to be organized by the election of a president and secretary from their own number. It is provided in the act that the board shall have charge of all appropriations to be made for the benefit or care of the insane of the state, and (by section 14) that "the board of trustees may take and hold, in trust for the hospital, any lands conveyed or devised, and any money or other personal property given or bequeathed, to be applied for any purpose connected with the institute."

This action was brought in the district court for Ramsey county, pursuant to a joint resolution of the state legislature, approved March 11, 1873, (Laws 1873, p. 283,) against the defendants Brown and others as trustees of the hospital, and against the defendant C. K. Davis, as governor of the state, to establish the title of the plaintiff to a large quantity of swamp-lands, granted to the state by act of congress before

mentioned, and which were claimed for the hospital under the legislation and proceedings stated in the complaint.*

The case made by plaintiff in its complaint is in substance as follows:

On March 6, 1863, the St. Paul & Pacific Railroad Co. was and has ever since been a corporation, and was then authorized to construct and operate a railroad from Stillwater, by way of St. Paul and St. Anthony, to Breckenridge on the Sioux Wood river, and certain branches, including a branch from St. Paul to Winona, and to acquire hold and convey lands. By an act of the legislature approved on that day, entitled "An act granting lands to aid the Saint Paul and Pacific Railroad Company in the construction of their branch railroad from Saint Paul to Winona," (Sp. Laws 1863, *c.* 4,) it is enacted as follows:

"Section 1. That for the purpose of aiding in the construc-

*The joint resolution referred to is as follows:

*Whereas*, By an act of the legislature of the state of Minnesota entitled "An act granting lands to aid the Saint Paul and Pacific Railroad Company in the construction of their branch railroad from Saint Paul to Winona," approved March 6, 1863, there was granted to said railroad company swamp-lands of the state of Minnesota to the amount of fourteen full sections to the mile of said branch road, to aid in the construction thereof; and

*Whereas*, By an act of the legislature of said state, entitled "An act to appropriate swamp-lands to educational and charitable institutions therein named, and for the purpose of erecting a state prison," approved February 13, 1865, swamp-lands of the state, not otherwise disposed of prior to the passage of said act, were directed to be selected and set apart for certain state institutions therein named, large amounts of which lands have been under said act so selected and set apart; and

*Whereas*, The title to the said lands so selected and set apart for said institutions is disputed by the Saint Paul and Chicago Railway Company: therefore

*Be it resolved by the Legislature of the State of Minnesota:*

Section 1. That the Minnesota Hospital for Insane, the Deaf, Dumb and Blind Asylum, the State Prison, and each of the normal schools of this state, by and in their respective names, or in the names of the trustees or other officers having the superintendence or control of said institutions, and the Saint Paul and Chicago Railway Company in its corporate name, are hereby empowered to institute and defend all such actions and

tion of a branch railroad from St. Paul to Winona, along the valley of the Mississippi river, there is hereby granted to the St. Paul and Pacific Railroad Company all the swamp-lands belonging to this state, lying and being within the limits of seven miles on each side of the line of said branch road from St. Paul to Winona, as the same shall be located and constructed; and as soon as any twenty continuous miles of said branch road shall be located, and as often thereafter as any further twenty continuous miles thereof shall be located, the said lands within the limits aforesaid shall be withheld from market and sale; and as soon as any twenty continuous miles of said branch road shall be completed, and as soon and as often thereafter as any further twenty continuous miles thereof shall be completed, the said lands within said limits shall be certified and conveyed to the said company by the governor

legal proceedings in the proper courts of this state as may be necessary to try and determine all questions concerning the title to any swamp-lands granted to, or selected or set apart for, any of said institutions, or said Saint Paul and Pacific Railroad Company for its Winona branch, under any act of the legislature of this state ; and all of the above-named institutions and said Saint Paul and Chicago Railway Company, under and by the names aforesaid, shall have the same power to sue and be sued, to defend and be defended in the courts of this state, in reference to any questions concerning the title to such lands, as if they were natural persons.

Sec. 2. That the actions and legal proceedings hereby authorized to be commenced and defended, may be either upon an agreed case, or be conducted in the usual way of civil actions; and the decision and judgment of the court therein, so far as respects the title to said lands, or any portion thereof, and the right to their use, enjoyment and disposition is concerned, shall be binding upon the parties to said action or proceedings, and upon the state of Minnesota, in the same manner and to the same extent as in other civil actions; but no order, decision or judgment shall be rendered in any such proceeding or action against any such institution for any costs, charges or disbursements incurred therein, nor for the recovery of any damages for the withholding of any of said real property or lands, nor for the rents, issues or profits thereof, nor in any manner affecting any property other than such lands belonging to any such institution or to the state, nor creating or declaring any liability or obligation for the payment of any money against the said state, or any such institution.

of the state. And if, when and as often as twenty continuous miles of said branch road shall have been completed with the cars running thereon, it shall be found that any portion of the said swamp-lands within the said seven miles have been sold or otherwise disposed of by the United States or this state, the amount shall be made up and supplied to said company out of the swamp-lands belonging to the state, to be selected by said company outside of said limits. And if, upon the completion of any twenty continuous miles of said road, as aforesaid, it shall be found that within the said seven miles of said line there shall not be an amount of swamp-lands on each side of said line, belonging to the state, equal to at least seven full sections per mile of said road so completed, then the said company shall have the right to and may select from the swamp-lands belonging to this state, outside of said seven-mile limits, other swamp-lands in an amount equal to such deficiency, and the said lands so selected by said company outside of said seven-mile limits shall be certified and con- veyed to said company by the governor of the state. And the said lands shall not be subject to taxation until the same shall have been sold and conveyed by the said company: *provided*, that if the said company shall not within three years construct and equip for business, with the cars running thereon, at least twenty miles of said road, and the residue thereof within five years from the passage of this act, then and in that case all the lands hereby granted, appertaining to the unbuilt portion of the said branch road, shall be forfeited to the state."

By an act approved March 1, 1861, (Sp. Laws 1861, *c*. 1, § 18,) it was provided that the Lake Superior & Mississippi Railroad Company, on compliance with certain conditions, should be entitled to have and to own in fee all the swamp-lands for seven miles on either line of its road, and that if it should be found that within those limits there should not be an amount of swamp-lands belonging to the state equal to at least seven full sections per mile, then the company should

have the right to select from the swamp-lands belonging to the state outside of those limits, and between the Mississippi river, Lake Superior and Rainy Lake, enough swamp-lands to make up the deficiency.

By an act approved March 12, 1861, (Laws 1861, c. 65,) all the swamp-lands then owned or which thereafter might be owned by or come into possession of the state within the then boundaries of the county of McLeod are donated to the agricultural college of the state.

By an act approved March 7, 1862, (Sp. Laws 1862, c. 56,) to aid the construction of a state road from Madelia in Watonwan county to the western boundary of the state, 10,000 acres of swamp-lands are appropriated, to be selected within six miles on either side of the road as located.

By an act approved February 16, 1865, (Sp. Laws 1865, c. 1,) for the purpose of aiding the Southern Minnesota Railroad Company in the construction of its railroad, all the swamp-lands in the odd-numbered sections in the Root river land-district, and also all the swamp-lands in the odd-numbered sections lying north of the Root river land-district, west of range 29, and south of the Minnesota river are set apart and granted to the railroad company.

By an act approved February 13, 1865, entitled "An act to appropriate swamp-lands to certain educational and charitable institutions therein named, and for the purpose of erecting a state prison," (Laws 1865, c. 5,) it is enacted as follows:

"Section 1. That as soon as the title to the swamp-lands donated by congress to the state of Minnesota shall become vested in this state, the commissioner of the state land-office shall, from the even-numbered sections of any such lands not otherwise disposed of prior to the passage of this act, proceed to select or cause to be selected and set apart for the erection and support of an insane asylum, one hundred thousand acres of swamp-lands; for the erection and support of an institution for the education of the deaf and dumb at Faribault, in this state, one hundred thousand acres; for the erection and

support of each normal school now established, or hereafter to be established in this state, not exceeding three, seventy-five thousand acres; for the erection and support of a state prison, one hundred thousand acres.

"Sec. 2. The commissioner of the state land-office shall cause to be kept in his office a record of the quantity, description, and date of selection of all lands selected and appropriated pursuant to the provisions of section one of this act.

"Sec. 3. All lands so selected and set apart by the commissioner of the state land-office shall, from and after said selection, be deemed to be reserved and irrevocably dedicated and set apart for the purposes for which the same were selected, and shall, upon the organization of any of the institutions hereinbefore mentioned, vest in the trustees or other officers having the superintendence or control of any of said institutions, in trust for the uses and purposes aforesaid: *provided,* that if from any cause there shall not be a sufficient quantity of such swamp-lands, then and in that case said commissioner shall select from the amount of said lands, *pro rata,* in the proportion of said subdivision in this act for each institution.

"Sec. 4. A certificate of the lands so selected, describing them and the purposes for which they were selected, under the hand of the commissioner and seal of the state land-office, shall be received in all courts as evidence of title to said lands in the trustees or other superintending officers of the institutions aforesaid."

(It is not alleged in the complaint that down to the date of the approval of this act, any attempt had been made by the St. Paul & Pacific Railroad Company to comply with the conditions of the act of 1863, before quoted.)

By an act entitled "An act to aid and facilitate the completion of the Saint Paul and Pacific railroad and branches," approved March 2, 1865, (Sp. Laws 1865, *c.* 6,) the time for grading and completing the respective portions of the line of that company, as fixed by law, was extended for two years,

on condition (among others not material) that the company should, within one year from the passage of the act, grade, ready for the ties, at least ten continuous miles of its branch road from St. Paul to Winona, and should, within two years from the passage of the act, construct and put in complete running order twenty consecutive miles of the same branch road.

Within one year from the passage of the last-mentioned act, the St. Paul & Pacific Railroad Company graded, ready for the ties, ten continuous miles of such branch road, and by an act entitled "An act to amend the charter of the St. Paul & Pacific Railroad Company," approved March 2, 1867, (Sp. Laws 1867, c. 1,) the time limited for the grading and completion of the respective portions of the road of that company was further extended for the period of two years.

Afterwards, and in the year 1867, the plaintiff succeeded to all the rights, franchises and property of the St. Paul & Pacific Railroad Company appertaining to the branch line from St. Paul to Winona, including its rights under the act of 1863; and by an act entitled "An act to amend certain laws relating to the St. Paul and Chicago Railway Company," approved March 4, 1868, (Sp. Laws 1868, c. 11,) the plaintiff was given until December 15, 1869, to complete that portion of its railway between the city of St. Paul and a point in Washington county, on the Mississippi river, opposite the city of Hastings "upon the condition, however, that said railway company shall not be entitled to have any of the lands which have been granted to aid in the construction of its said railway from St. Paul to Winona, certified and conveyed to it, until, in addition to the completion, within the time aforesaid, of said portion of its said railway between St. Paul and the aforesaid point on said river, opposite the city of Hastings, it shall have graded and made ready for the ties so much of its said railway as is or shall be finally located between the cities of Hastings and Red Wing."

This act further provides that upon satisfactory evidence

being furnished the governor of the state of the completion of the road to a point opposite Hastings, within the time aforesaid, (*i. e.* by December 15, 1869,) and of the grading between Hastings and Red Wing within the time prescribed by law, "the said company shall be entitled to have certified and conveyed to it the lands, to be selected by such company, which it would be entitled to upon the completion of the first twenty consecutive miles of its said railway under existing laws: and also, upon such evidence being so furnished the governor, the same shall be accepted and deemed a full and complete compliance" with the proviso of the act of March 2, 1865, before mentioned.

By a subsequent act, approved March 5, 1869, (Sp. Laws 1869, *c.* 55,) amendatory of that last cited, the time for the completion of plaintiff's railway to a point opposite Hastings was further extended to April 1, 1870.

Prior to April 1, 1870, the plaintiff completed its railway to a point opposite Hastings, and prior to March 1, 1872, completed and had in operation, with the cars running thereon, its entire line from St. Paul to Winona, a distance of 103 miles, thereby completing the performance of all the conditions to be performed to entitle it to a conveyance from the governor of swamp-lands amounting (at fourteen sections per mile of road, the quantity claimed by plaintiff under the act of 1863,) to 1442 sections, or 922,880 acres, of which but 3,541 91-100 acres were found within the seven-mile limits fixed in the act of 1863, leaving a deficiency of 919,338 9-100 acres to be made good by selections from the swamp-lands outside the limits. The plaintiff has received 112,032 10-100 acres, including the 3,541 91-100 acres within the limits, and has been, ever since March 1, 1872, and is entitled to swamp-lands from the state, in addition to the swamp-lands so conveyed and certified to it, to the amount of 810,847 90-100 acres.

On September 15, 1870, the commissioner of the state land-office, acting in pursuance of the provisions of the act

of February 13, 1865, selected and set apart for the erection and support of the hospital for insane, 19,816 78-100 acres of swamp-lands, in even-numbered sections, granted by congress to the state, making the proper record thereof, and afterwards made and delivered to the trustees of the hospital a certificate of the lands so selected and set apart, containing the description required by the act of February 13, 1865, of which certificate a copy is annexed to the complaint.

The complaint further states that the entire quantity of swamp-lands patented to the state by the United States is 923,825 27-100, which have been disposed of by the state, as follows, under the acts before cited: There have been conveyed to the Lake Superior & Mississippi Railroad Company 567,247 84-100 acres, and to the Southern Minnesota Railroad Company 32,342 44-100. There have been set apart for the agricultural college 4,684 17-100 acres, and for the state road from Madelia 4,563 71-100. There have also been selected and set apart from the even-numbered sections, for the state institutions named in the act of February 13, 1865, 104,178 21-100 acres, including the 19,816 78-100 acres set apart for the hospital for insane; and there have been conveyed to the plaintiff 112,032 10-100 acres, making a total of 825,048 47-100 thus disposed of by the state, and leaving but 98,776 80-100 acres undisposed of, nearly all of which are liable at any time to be set apart by the commissioner of the state land-office under the provisions of the act of February 13, 1865. Substantially all the swamp-lands to which the state is entitled, embraced within the surveyed portions of the state, have already been patented to the state.

The complaint further alleges that after the completion of that part of the railway between St Paul and a point opposite Hastings, with the cars running thereon, and after the grading, ready for the ties, of that portion of the railway between Hastings and Red Wing, and after the completion of the railway from St. Paul to Red Wing, with the cars running thereon, a continuous distance of forty miles, and after the

plaintiff had become entitled to more than 300,000 acres of land to make up the deficiency to which it was entitled by reason of there not being found on each side of the line of its railroad swamp-lands equal to seven full sections per mile of said road as completed, the plaintiff selected, in order to make up in part such deficiency, the land so selected and set apart for the hospital for insane, and notified the then governor of the state of such selection, and demanded of him a conveyance of such lands, which he declined to execute : and that, after the completion of its entire line of railway from St. Paul to Winona, with the cars running thereon, and after the conveyance to it by the state of all the swamp-lands within the seven-mile limits along its entire line, amounting to 3,541 90-100 acres, the plaintiff, in March, 1874, prepared and presented to the defendant Davis, then and still governor of the state, a deed of conveyance in due form, from the governor to the plaintiff, of the lands so selected and described in the copy of certificate annexed to the complaint, and demanded of the governor that he execute and deliver such deed, with which demand the governor refused and still refuses to comply.

After stating that the lands in question are vacant and unoccupied, and that the defendants claim an estate or interest therein adverse to the plaintiff, the complaint concludes with a prayer that the rights of the parties respecting the said lands may be determined; that the plaintiff may be adjudged to be entitled to all and singular the lands described in the copy of certificate annexed to the complaint; and that the defendant Davis, or his successor in the office of governor, be directed to execute and deliver to the plaintiff a conveyance of all such lands in fee simple, or that the judgment of the court be declared to stand in the place of such conveyance; or that the plaintiff be adjudged to be the owner in fee of said lands and the defendants to have no valid claim or title thereto, and that the defendants and their successors, etc., be forever enjoined from setting up any claim to such lands, or any part thereof, adverse to the plaintiff, its successors or

assigns; that such judgment be recorded in the registry of deeds in the several counties where any of such lands are situate, and for general relief.

To this complaint the governor demurred, on the ground (1) that the court has no jurisdiction of his person, it appearing on the face of the complaint that he is proceeded against as governor and not otherwise; and (2) that the complaint does not state facts sufficient to constitute a cause of action. The trustees also demurred, assigning the following grounds: (1) that the court has no jurisdiction of their persons or of the subject of the action; (2) that the plaintiff has not legal capacity to sue; (3) that there is a defect of parties defendant; (4) that the complaint does not state facts sufficient to constitute a cause of action. Both demurrers were sustained by *Wilkin*, J., and the plaintiff appealed.

*Bigelow, Flandrau & Clark,* for appellant.

The complaint shows that the plaintiff has legal capacity to sue. The power to sue is necessarily incident to every corporation, (Angell & Ames, § 110; 2 Kent, 283,) and the joint resolution of March 11, 1873, expressly authorizes plaintiff to bring this suit.

There is no defect of parties defendant. The joinder of the governor cannot be objected to by the trustees as a defect of parties. Though not a necessary party, it was proper to join him as a defendant and give him an opportunity to defend the action. *Manning* v. *Nicaragua,* 14 How. Pr. 517.

The act of congress granting swamp-lands to the state, which was passed March 12, 1860, (U. S. Rev. St. §§ 2479, 2480, 2490) was a grant *in præsenti* to the state of all the swamp-lands therein, wanting, however, identity to make it perfect. Survey and selection of the lands were necessary to give it precision; but when these were made the title passed by virtue of the act and as of the date of its passage, and not by virtue of anything done after its passage. *Rutherford* v. *Greene's Heirs,* 2 Wheat. 196; *Lessieur* v. *Price,* 12 How. 76;

*Railroad Company* v. *Fremont County*, 9 Wall. 89; *Railroad Co.* v. *Smith*, 9 Wall. 95; *Schulenberg* v. *Harriman*, 21 Wall. 44.

At the date of the grant to plaintiff's predecessor by the act of March 6, 1863, (Sp. Laws 1863, *c.* 4,) the state had not a perfected title to any swamp-lands, the first lists of such lands having been certified to the state on June 30, 1865, and no patents issued until sometime thereafter. The words "belonging to the state," in that act, must therefore necessarily refer to lands held by the state by the tenure above mentioned, before identity had been given them by survey and selection.

The title taken by the railroad company from the state was also a present title, but required, to give it precision, (in addition to the things necessary to perfect the title of the state,) as respects the inconsiderable portion of the grant within the seven-mile limits, the location of the road; and as respects the main part of the grant—that outside of those limits—a selection by the company, after the completion of its road in sections of twenty miles, from the swamp-lands belonging to the state, the act providing that the selection may be made immediately on the completion of the twenty-mile sections, and that the lands selected shall be certified and conveyed by the governor to the company.

Annexed to this grant of a present title was a condition that if the company should not, within three years, construct and equip for business, with the cars running thereon, at least twenty miles of the road, and the residue within five years from the passage of the act, all the lands thereby granted, appertaining to the unbuilt portions of the road, should be forfeited to the state—clearly a condition subsequent. The extensions of time for the performance of this condition were in every instance granted before the expiration of the time previously limited, so that the company was at no time in default. A condition subsequent can only be reserved for the benefit of the grantor and his heirs, and the mere failure to perform does not divest the estate without entry. And the grantor's possibility of reverter is extin-

guished by conveyance to a stranger before entry for breach of condition; for the grantee cannot enforce a forfeiture since the right to enforce it is not assignable and never passed to him; and the grantor cannot enforce it, since he is estopped by his deed. 4 Kent, 122, 126; 2 Washb. Real Prop. 11; 3 Id. 303; *Rice* v. *Boston & Worcester R. Co.*, 12 Allen, 141; *Guild* v. *Richards*, 16 Gray, 309; *Nicoll* v. *New York & Erie R. Co.*, 12 N. Y. 127; *Hooper* v. *Cummings*, 45 Me. 359. The same doctrine is applicable to a grant upon condition subsequent, proceeding from the government. *Schulenberg* v. *Harriman*, 21 Wall. 44. The trustees of the hospital, therefore, even if the title to the lands set apart by the act of February 13, 1865, (Laws 1865, *c. 5*,) vested in them by virtue of that act as against the state, could not be injured by the extension of time for performance of the condition, given before breach, since, even if there had been a breach, they could not have availed themselves of it.

But that act does not vest or intend to vest any title in the trustees or elsewhere beyond the control of the state. It does not assume to place the lands above legislative control, but to vest them in public officers, for public uses—that is, for the grantor's own uses. The hospital intended by the act was a public institution, to be established and carried on by the state, for the benefit of the state, and at the public expense; the trustees intended were to be public officers, deriving all their rights and powers from the state, and holding them subject to its will. And such was the institution created and organized by and under the act of March 2, 1866, (Laws 1866, *c. 6*, Gen. St. 1878, *c. 35*, tit. 3,) such were the trustees thereby appointed, and such were to be and are their successors thereby provided for. The trustees can exercise no power of disposition over the property confided to them by the state, except at the time, in the manner, for the uses and for the consideration prescribed by the legislature, nor can they continue to hold it against the legislative will. The legislature may at any time abolish the institution and resume all its

grants of power or property, or may resume such of these grants as it sees fit, without abolishing the institution or the office of trustee. Indeed, by Laws 1875, c. 95, § 3, (Gen. St. 1878, c. 38, § 76,) the state has already assumed to take all swamp-lands from the control of the trustees, and to place them in charge of the state land-commissioner, to be disposed of in the same manner as school-lands are by law disposed of; and its power and right to do so, as against the trustees, will not be questioned.

But, though it is conceded that the rights of no third parties have intervened between the plaintiff and the state, still it is claimed that the state has the right to the lands in question as against the plaintiff. This claim must be founded solely on the ground that the state has, by its own legislative act, assumed to set apart and dedicate these lands for certain public uses—in other words, that it has declared its will to retain and keep the lands for its own uses.

But (1) the legislation had does not indicate any intention on the part of the state to withhold these lands as against a right thereto perfected in the plaintiff pursuant to the provisions of the act of March 6, 1863. The act of February 13, 1865, provides that the lands to be set apart for the hospital and other institutions shall be taken "from the even-numbered sections of lands not otherwise disposed of prior to the passage of this act." This must refer to a disposition by prior grants by the state in the nature of a float, for all its previous grants had been of that nature. The state, prior to this time, had never disposed of a single tract of identified swamp-land, and had none such to dispose of; and the terms of the act indicate the character of disposition intended, for the exception is out of lands not then, but thereafter to become, vested in the state.

And with the exception of the grant to the agricultural college of all the swamp-lands within the boundaries of the county of McLeod, (Laws 1861, c. 65,) the identification of each of the prior state grants did not depend wholly upon

acts to be done by the United States or the state, but also upon acts to be done, in the future, by the grantees. The grant to the Lake Superior & Mississippi Railroad Co. (Sp. Laws 1861, *c.* 1, § 18,) was of all the swamp-lands within seven miles on either side of its road, and of enough lands in addition to make seven full sections to the mile, to be selected by the company from the swamp-lands belonging to the state; and such was the nature of the grant to the plaintiff's predecessor by the act of 1863; and the grant for the Madelia road (Sp. Laws 1862, *c.* 56,) was of 10,000 acres, to be selected within six miles of the road as located, as soon as the public lands through which it passed should be surveyed, etc. The proportion of these grants to which precision could be given without further act by the grantee is inconsiderable. A small proportion could be identified by the location of a road alone; but the identification of the bulk and substance of these grants is made to depend, also, upon a selection by the grantees from the swamp-lands of the state, or some designated part of it. It is not to be assumed that the legislature intended to ignore and thus defeat the object of these former grants, under which the grantees held their lands by the same tenure as the plaintiff's predecessor held its lands; but rather that the legislature intended, by the exception, to exclude from the operation of the act of February 13, 1865, all lands held by that character of tenure. Besides, the words "lands not otherwise disposed of," would except from the operation of the act all that portion of the swamp-lands to become vested in the state to which the prior grantees of the state would be entitled, if that act had not been passed.

The proviso that, in case of a deficiency, the designated institutions should share *pro rata,* would not have been inserted, had the legislature intended to appropriate to the state institutions lands which otherwise might be selected to fill prior grants; for in that case, as there would have been substantially all the swamp-lands of the state, contained in the even-numbered sections—that is, one-half of the entire swamp-

land grant of the state—from which to fulfil the act, there would have been no such probability of a deficiency as to have suggested the proviso.*

The requirement that the land-commissioner shall set aside the lands for the state institutions as soon as the title is vested in the state—that is, as soon as they are certified or patented to the state—thus apparently depriving the prior grantees of the state of an opportunity to select and identify lands to fill their grants before the lands were placed beyond their power, ought not to control the clear general intent of the statute; and if, in order to ascertain what lands have been "otherwise disposed of," it is necessary that prior grantees should have an opportunity to fill their grants out of them, those last-quoted words of themselves qualify those which, taken alone, would impose immediate action on the land-commissioner.

The provisions of the act of March 4, 1868, (Sp. Laws 1868, c. 11,) also indicate that it was not the purpose of the previous legislation for the endowment of the state institutions to impair any right of the company.

Giving the state credit for an honest desire to fulfil its contract obligations, and acknowledging also that the state desired to endow those institutions from the remnant of its swamp-lands, and thus to save the remaining lands from other dispositions deemed less beneficial, it is a proper and fair deduction, and one which reconciles prior and subsequent legislation, that the legislature intended that the endowment of these institutions should be made out of the remnant of the swamp-land grant available for that purpose, after prior contracts of the state had been fully performed, or the rights of the parties under them forfeited, and that such endowment should be identified and set apart at the earliest practicable time. As the lands in controversy, being within the exception, are not of the character authorized to be set apart, the commissioner may set apart others in their place, if there are or shall be

*See p. 525, *supra.*

any available for the purpose, until there is a valid setting apart of the entire quantity appropriated.

But (2) if the purpose of the act of February 13, 1865, was to withdraw the lands in controversy, or any others, from the power of the plaintiff to select and thus perfect its title to them under the act of 1863, then the act of 1865 impairs the obligation of the contract between the state and the plaintiff's predecessor, and is unconstitutional and void.

A grant of lands is an executed contract, and such contracts are as much within the purview of the constitutional prohibition of laws impairing the obligation of contracts as executory contracts. *Fletcher* v. *Peck*, 6 Cranch, 87; *Terrett* v. *Taylor*, 9 Cranch, 43; and therefore it is immaterial in this case whether the act of March 6, 1863, is an executed contract between the state and the plaintiff's predecessor, or an executory contract, or partly executed and partly executory.

The grant of a quantity of lands was a continuing contract that the state would not reassert any right to the lands so granted, or, if the contract be considered as partly executory, the grant of a certain quantity of lands, to be selected by the grantee in the future, was a contract that the state would not, by any subsequent act, defeat or impair the grant by defeating or impairing the right or power of selection. The plaintiff and its predecessor, having fully performed the contract on their part, are entitled to the full benefits to accrue to them, by its terms, upon such performance—that is, to select from the swamp-lands belonging to the state a large amount of such lands, and, their title being perfected by such selection, to have a deed from the governor to evidence it. The answer of the defendants to this claim is that the state has resolved to set apart and retain these lands for a certain public use—its own use. The character of the use is immaterial. The state might as well have resolved to retain them for the purposes of its general revenue.

That the state is not all surveyed, and that there may be other lands hereafter certified to the state out of which plain-

tiff's grant may be filled, is not an argument against plaintiff's right to the lands in question, but that plaintiff will not be injured by a violation of that right. But plaintiff's right is a right to lands already selected, to be presently enjoyed, and is of greater value than the mere hope, uncertain of realization, of other lands to be taken at the dictation of another, at an indefinite future time; and if the state may withhold for its own uses these swamp-lands in even-numbered sections to which the plaintiff's title has become perfected under the act of 1863, it has the same power to withhold the same or any greater quantity in the odd or in the even-numbered sections, or in both. The substantial aid intended for the enterprise would become delusive and valueless.

It is argued that the power of selection in the company would disable the state from disposing of any swamp-lands till the road was completed—an argument directed against the plaintiff's contract from the inconvenience of performing it; but this would not prevent the state from disposing of the remnant of its swamp-lands by a grant in the nature of a float—the only kind of grant the state has attempted to make down to this time. The state has never indicated or had any policy of disposing of its swamp-lands by selling them in tracts in market; in fact, it has had no occasion to adopt any such policy, for its swamp-lands, as fast as they were identified and certified, have been taken up by the state's prior grantees. The state could not have been embarrassed by reason of any such tying-up of its lands, because it had the right to refuse any of the numerous extensions the company was obliged to ask, and could thereupon have forced the company to build its road and make its selections, and, on default of the company, have declared a forfeiture and resumed its grant.

The provision in the act of 1863, that on the location of the road, in sections of twenty miles, the lands within the seven-mile limits shall be withheld from market and sale, and that if, on the completion of any twenty-mile section, it shall be found

that any portion of the swamp-lands within the seven-mile limits have been sold or otherwise disposed of by the United States or the state, the amount shall be made up and supplied to the company out of the swamp-lands belonging to the state, to be selected by the company outside of such limits, were probably taken from acts of congress in aid of railroads. If these provisions by implication reserve to the state the power to dispose of swamp-lands pending the building of the road, then the reserved right must be confined to sale by tracts in the market pursuant to some general system established by law, because that is the character of disposition referred to in the provisions which give rise to the implication referred to. The state had already established such a system for sale of its school-lands. The fact that disposition by the United States is coupled with disposition by the state confirms this view. An implication from these words, of a reserved power to make unrestricted disposition of the swamp-lands must be rejected as repugnant to the grant. But the disposition made by the act of February 13, 1865—if any disposition were made by that act, which is denied—was of an altogether different character. If by that act the title passes from the state at all, it passes, upon the setting apart and certifying of the lands, not by virtue of those proceedings, but by virtue of the act itself, and relates to the time of its passage. The grant is as much a float as that to the railroad company. No implication of the right to do what is claimed to have been done by the act of February 13, 1865, can be drawn from these subordinate provisions of the act of 1863, unless the implication be of a reserved right in the state, as against the company, to dispose of part or all its swamp-lands by a subsequent grant in the nature of a float. Such a construction is repugnant to the grant, and nullifies the act of 1863; for, if that act is good for anything, it is good as against a subsequent grant of the same right.

Besides, these subordinate provisions do not propose a diminution of the grant nor a postponement of it. They

were intended for the benefit of the grantee, and to secure the integrity and beneficial features of the grant. The reserved power of sale or disposition, if any is to be implied, cannot reach beyond the lands in excess of those required to fill the plaintiff's grant when and as often as it is entitled to be fulfilled, because the very clauses from which the implication of the power to sell is sought, provide that the deficiency caused thereby shall be made up out of swamp-lands belonging to the state, to be selected by the company outside the seven-mile limits; and this, taken with the next paragraph of the act, is a contract that the state shall not disable itself to deed to the company fourteen full sections to the mile as soon as and whenever any continuous twenty miles of the road are constructed.

The purpose of the act being to make a substantial grant of swamp-lands to procure the building of the road, that main purpose cannot be nullified by an implication drawn from the subordinate and incidental provisions of the act. If an implication can be drawn from them of a reserved right in the state to dispose of its swamp-lands according to its will and pleasure, without respect to the railroad company, the act contains within itself the principle of its own destruction.

But whatever right the state might have under the act of March 2, 1863, to dispose of swamp-lands as against the plaintiff, it certainly has no right to keep and hold lands covered by the act and selected by the plaintiff. It cannot resume its own grant.

The trustees, although holding these lands subject to the control of the legislature, for public uses, are not exempt from the jurisdiction of the court. They are not officers of the executive department, and not protected from suit by the constitution. The rule that the state cannot be sued applies only to cases where the state is a party defendant to the record. It is not enough to oust the jurisdiction of the court that the defendants are agents of the state.

Moreover, the state or its agent may be sued by consent

duly given by the legislature.	*United States* v. *M'Lemore,* 4 How. 286; *Hill* v. *United States,* 9 How. 386; *Marbury* v. *Madison,* 1 Cranch, 137.

Counsel also argued that the joint resolution of March 11, 1873, was sufficient to give the consent of the state to the bringing of this action, citing many instances of proceedings by resolution, instead of by bill, in this and other states: and that by the act of March 6, 1863, the plaintiff was entitled to fourteen full sections of swamp-land for each mile of road, citing the definition by Dr. Webster, of "each" as "a distributive adjective pronoun, used either with or without a following noun, and denoting every one of the two or more individuals composing a whole, considered separately from the rest," and of "both," as "the one and the other; the two; the pair or couple, without exception of either."

*L. M. & D. A. Brown* and *Horace Austin,* for the trustees, respondents.

1. If the trustees or directors of the several state institutions named in the act of February 13, 1865, or the institutions themselves, are independent corporations or associations, with the right, among other powers, to take and hold title to real estate, then and in such case the time for the completion of the road could not have been extended after the date of the grant to those institutions; and, as it appears from the complaint that the terms of the original grant to the company were not complied with, the plaintiff is not entitled to recover.

2. If the ownership of and title to the lands in question is, as between the state and those institutions or their respective officers, in the state and not in such institutions or officers, (*Regents of University* v. *Hart,* 7 Minn. 61,) then and in such case, the trustees are but the agents and officers of the state, acting in an executive capacity, and having no such legal title to or interest in the lands as can be conveyed to or conferred upon the plaintiff by a judgment or decree of the court, even though the equitable title should be found in the plain-

tiff. *Rice* v. *Austin*, 19 Minn. 103; *County Treasurer* v. *Dike*, 20 Minn. 363.

3. If the legal title to the lands is in the state, the governor cannot be required by the court to convey; and no alternative decree will be rendered by the court where the court has no power to direct and insist upon both conditions involved in the alternative.

4. The defendants are therefore entitled to judgment, even though the plaintiff should show itself entitled to sue and the court to have jurisdiction of the defendants in their official capacity; but the defendants being only the executive agents and trustees of the state, and the plaintiff attacking them in their official capacity, the plaintiff is not entitled to bring or maintain this action against them, for the reason that the court has no jurisdiction over them in the capacity in which they are sued. This is, in legal effect, a suit against the state, and no state can be sued—certainly not unless it waive its sovereignty, and authorize the suit by an act having the full force and effect of law. The joint resolution of 1873 has no such effect, for the constitution (art. 4, § 13,) requires that the style of all laws shall be "Be it enacted," etc. When new laws are to be passed or existing laws repealed, it must be done by bill, in the style and form prescribed by the constitution, and duly enacted into a law. The joint resolution is at most merely a formal expression of the sense or sentiment of the legislature.

*Geo. P. Wilson*, Attorney General, and *Young & Newel*, also for the respondents.

1. The act of March 6, 1863, was not a present grant to the St. Paul & Pacific Railroad Company of the lands involved in this suit, or of any lands whatever.

It seems to be settled by the decisions of the supreme court of the United States that the act of congress of March 12, 1860, (12 St. at Large, 3,) extending to Minnesota the provisions of the swamp-land act of September 28, 1850, (9 St. at Large, 519,) was a present grant to the state of all the swamp-lands

within her limits. The words of the act are words of present grant, and the grant itself is of *all* the lands of the grantor, of a specific description, within the state, and is not subject to any condition or contingency. It is like the instances often put by way of illustration in Coke Littleton, and others of the older books, "if I grant all my lands," and like a devise of all a testator's lands of a certain kind, or of all his lands—a disposition as valid and effectual to pass a present title, as it is common.

For instances of such grants by general words, see *Jackson* v. *DeLancey*, 11 John. 365; *Jamaica etc. Corporation* v. *Chandler*, 9 Allen, 159; *Prettyman* v. *Walston*, 34 Ill. 175.

The plaintiff claims that in this respect the act of March 6, 1863, has the same effect as the act of congress—that it was a present grant to plaintiff's predecessor of the lands now in controversy, and that upon the passage of the act, and by the mere force thereof, the St. Paul & Pacific Railroad Company at once became the owner in fee of those lands; its estate being subject to certain conditions subsequent, which, however, have been either dispensed with, or fully performed. But this claim ignores a fundamental and elementary distinction between present grants passing a present title to specific property, and mere executory promises or agreements. By the act of congress all swamp-lands are granted to the state; and the character of any piece of land, as swamp-land or otherwise, is fixed and certain at the time of the passage of the act. To know whether any given piece of land was granted by that act, it is only necessary to know whether it was swamp-land, within the meaning of the act, or not. To be sure the act prescribes in what manner the fact that any piece of land is swamp-land is to be ascertained in the future; but the existence of the fact does not depend on the time when or the manner in which it is to be ascertained. *Railroad Co.* v. *Smith*, 9 Wall. 95.

By the act of 1863, however, no specific land is designated. No swamp-lands are severed from the general body of the

swamp-lands of the state; for such severance could be effected only by a specific designation of the land so severed, and no such designation was or could be made by the act. Two classes of land are therein mentioned, (1) such swamp-lands as should be found to be within the limits of seven miles on each side of the company's railroad, as the same should thereafter be located and constructed; (2) such swamp-lands, outside the seven-mile limits, as the company should select to make good any deficiency of lands within those limits. As to the first class, it could not be known, until the location of the road, where the seven-mile limits would lie, or what they would include, and until the road was located, there could be no such limits. Whether any given piece of land was or would be included in the first class of lands, depended not merely on a fact existing at the date of the act, (*e. g.* its character as swamp-land,) but upon the happening of a future and wholly contingent event, viz., the location of the road within seven miles of it; and as to the second class of lands,—those to be selected outside the seven-mile limits to make good any deficiency within the limits,—in which class the lands involved in this suit are found, whether any given piece of land was or would be included in this class depended not only on all the contingencies affecting the first class of lands, but also upon the happening of three other contingent events, (1) that at least twenty miles of the railroad contemplated by the act should be constructed, etc.; (2) that in some twenty-mile section of the railroad as located and constructed, it should be found that there was a deficiency of swamp-lands within the seven-mile limits; and (3) that such piece of land should be selected by the company to make good the deficiency. Only upon the happening of all these contingencies, could the company acquire title in fee to, or be entitled to a conveyance from the state of any given tract of land as indemnity land. But if the plaintiff's assumption is well founded,—if the company, by the mere force of the act, and immediately upon its passage, acquired a present estate in fee in the lands in

controversy, defeasible on condition subsequent, then the company would and did acquire such estate in these lands at that time, although none of the contingencies had occurred, the happening of which is made by the act a condition precedent to the vesting of any estate in the company.

And if, immediately upon the passage of the act of 1863, the company acquired a present title to any swamp-lands, as being within the seven-mile limits of the road, as it should thereafter be located, it acquired title in fee to every acre of swamp-lands within seven miles of any possible location of the road.

The plaintiff's argument is not that the company has located and built the road, has found a deficiency within the limits, and has selected these lands to make it good; and has, in consequence of and upon the happening of these events, and the performance of these conditions, acquired a right to the conveyance of these lands to it by the state. Plaintiff does not claim that it acquired its title upon its selection, and as of that date; but it claims these lands as indemnity lands, by the mere force of the act of 1863, as a present grant of these lands in fee, defeasible upon certain conditions subsequent, which have, however, been either dispensed with or performed; and if this position of the plaintiff can be sustained, then, if upon any possible location of the road, there could possibly be a deficiency, the company became on March 6, 1863, the owner in fee of all the swamp-lands in the state, (outside the limits allotted to the Lake Superior & Mississippi Railroad Co.,) or at least a tenant in common with the state in all such swamp-lands, according to the proportion which the unascertained possible deficiency might be found to bear to the unascertained total amount of swamp-lands granted to the state. This must be so, because, upon the passage of the act of 1863, the company had the same title to all the swamp-lands in the state that it had to the lands now in controversy; and plaintiff claims that upon the passage of that act it at once became the owner in fee of these lands.

And if the act of 1863 was a present grant to the company of an estate in fee in these lands, defeasible on condition subsequent, then the company has, ever since the passage of that act, been the owner of these lands, and would to-day be the owner of them in fee, free from any condition, and even if it had not built the road. It appears from the complaint that the conditions in the act of 1863 were afterwards, and before the plaintiff's road was located, waived and dispensed with by the state, as was also the condition in a subsequent act requiring the building of the Stillwater road. Conditions subsequent are not favored by the law; and it is a rule as old as the Year Books that a condition subsequent once dispensed with, in whole or in part, is gone forever. *Williams* v. *Dakin,* 22 Wend. 209; *Sharon Iron Co.* v. *Erie,* 41 Pa. St. 341.

These consequences, however absurd they appear, follow necessarily from the plaintiff's assumption that the act of 1863 was a present grant in fee of the lands in question, defeasible by condition subsequent.

It is true that in some portion of the argument for the plaintiff, the act of 1863 is treated as if it granted not lands, but merely a title, a present title indeed, but requiring certain things to be done in the future to give it precision.

But what is meant by a "title" detached from any specific land? How can one have a present title not attached to any specific land, and which will apply as well to one piece of swamp-land as to another, and which gives the owner of the title no estate in any one tract of swamp-land rather than in any other? No such title as this is known to the common law. It is believed that this fiction of a title not attached to any specific land—a floating title—had its origin in an attempt by the courts to define the rights of beneficiaries under certain acts of the states and of congress, similar in their terms to some parts of the act of 1863. Several cases in which these rights are discussed are cited by plaintiff to show that the state took a present title and estate in all the swamp-lands within her limits, by virtue of the acts of con-

gress already referred to. But none of these cases is an authority for the position that where not all the land of a certain kind is granted, but the act in terms only purports to grant a certain quantity of land, to be selected, the beneficiary acquires any title to any specific land. Thus in *Rutherford* v. *Greene's Heirs*, 2 Wheat. 196, it is not held that any title to any land vested before survey, etc. So in *Lessieur* v. *Price*, 12 How. 76, it is expressly decided that the state took title to the land there in question, not on March 6, 1820, the date of the passage of the act of congress, but on June 28, 1821, when the governor notified the surveyor general that such land had been selected and located by the state. So in *Railroad Company* v. *Fremont County*, 9 Wall. 89, it is said (p. 94) that "until the line of the railroad was definitely fixed upon the ground, there could be no certainty as to the particular sections of land falling within the grant; nor could the title to any particular section on the line of the road vest in the company." And in *Schulenberg* v. *Harriman*, 21 Wall. 44, the route of the railroad had been located, so that the alternate sections referred to in the act had become fixed, at the time when the court holds the state to have been the owner of them. It is true that in some of the cases such acts are said to grant a present title, which requires to give it precision, that the lands to which it shall attach shall be identified, and in *Railroad Company* v. *Smith*, 9 Wall. 95, *Miller*, J. (at p. 99) likens floating grants for railroads to the grant of swamp-lands to the states, but at once proceeds to point out the marked difference between them.

The meaning of the decisions of the supreme court of the United States in regard to these floating grants, or "vagrant grants" as they are styled by Chief-Justice Marshall, is simply this: Where an act purports, by words of present grant, to grant a certain number of sections or acres of land not specifically designated, the grantee acquires, by force of the act, the right to receive that number of acres of land; and when, in the manner provided by the act, as by the location

of a railroad, or by a selection, this "vagrant" grant finds a local habitation, this "float" comes to anchor, then the grantee becomes the owner of the land selected, etc., by the mere force of the act of congress, and without the issuance of a patent, which is merely the evidence of title. A deed by an individual of a quantity of land to be located would be void for uncertainty as a deed, and, though valid as a contract to convey, would not of itself pass the land to the grantee, upon his location, another deed being required, specifically describing the land. But the act of congress or of the legislature operates at first, and before the location and specific designation, as a mere promise to convey a certain quantity of land; but after location, etc., this act operates as an actual grant and conveyance of the specific tracts of land selected.

The subject itself is entirely free from difficulty, and it is submitted that the invention of a "present title," not attached to any land, has tended in many cases (as in this) to surround with obscurity that which is in itself entirely clear. In this case, the act of 1863 is silent as to title. It does not purport to grant a title. It is no more a present grant of title, or of any specific land, than an ordinary land-warrant, or the act of congress authorizing it, is a present grant of either. The act is nothing more than a promise by the state to convey to plaintiff's predecessor, on performance of certain conditions precedent, a quantity of land, the location of a part of which is to be determined by the location of the proposed railroad, and the location of the residue by a selection by the railroad company from a larger quantity, described in the act, in substance, as all the swamp-lands which shall not have been sold or otherwise disposed of by the state at the time the selection is made. So far as the indemnity lands are concerned, this is the whole effect of the act. The company merely had, at the farthest, certain conditional rights under an executory promise. The only title and the only property the company acquired by the act was the right to claim the performance of the promise of the state, when the company should have

performed the conditions on which the promise was made. It acquired no title to any land, no property in any land. There was not an acre of swamp-land in Minnesota of which it could demand a conveyance from the state, for which it could bring ejectment against an occupant, from which it could remove a trespasser, or for injury to which it could have any action at law or in equity.

The position that the company acquired by the act of 1863 no vested rights in any lands, is fully sustained by the case of *Smith* v. *United States,* 10 Pet. 326, and *Fremont* v. *United States,* 17 How. 542. And to the same effect are the opinions of Attorney-General Cushing in regard to Iowa railroad grants (1 Lester Land Laws, 512, 513,) and of Attorney-General Black (1 Lester, 524,) in regard to grant for Little Rock & Fulton railroad, (1 Lester, 196, 197.) And the defendants' position is fully sustained by the construction put upon this very act by Attorney-General Cornell, in September, 1869. MS. Vol. of Opinions, 486.

Moreover, it is only with respect to the lands within the seven-mile limits that words of present grant are used in the act of 1863. Of the lands outside the limits—and such are the lands under consideration—the act does not purport to grant *in præsenti* a single acre, or the title to a single acre. The words are that any deficiency of swamp-lands within the seven-mile limits "shall be made up and supplied to said company out of the swamp-lands belonging to the state, to be selected by said company outside of said limits;" and again, "The said company shall have the right to and may select, * * * * and the lands so selected * * * * shall be certified and conveyed to said company." If authority be necessary to show that, even on the plaintiff's own construction of "grants in the nature of a float," no present title to anything passed by the provisions as to indemnity lands, it may be found in *Foley* v. *Harrison,* 15 How. 433, 447.

2. By the act of March 6, 1863, the state was not precluded from subsequently making such disposition as she

pleased of the lands in suit, either by grant or otherwise, before they were selected by plaintiff.

By that act the state merely promised to give to the company, to make up possible deficiencies, lands to be selected by the company from such swamp-lands as should not have been disposed of by the state before selection made; and until the company began to perform the conditions, this was a mere naked promise, which the state could revoke or modify at pleasure.

The whole act taken together shows that the state merely intended to allow a selection from lands that had not been already disposed of when selection was made; and instead of treating the act as a general authority to select from all lands, with an exception of such lands as should have been sold, or reservation of a right to sell, it should be treated as if it read "may select from any swamp-lands belonging to the state and not otherwise disposed of," etc.—that is, that these words, "not otherwise disposed of," should be regarded as a part of the very description of the lands from which the deficiency is to be supplied, so that there would be no need of any exception or reservation of lands that should then have been sold or disposed of. This construction is the more reasonable, because we are not dealing with a deed or present grant, but merely with a promise to grant lands to be selected from a larger quantity, and the words, "belonging to" and "not otherwise disposed of," are part of the description by which this larger quantity is designated. But, assuming the plaintiff's position that any power of sale or disposition of these lands, after the passage of the act of 1863, must be derived from some reservation or exception in that act, the act evidently contemplates that the state shall have the power to sell or otherwise dispose even of the lands which might prove to lie within the seven-mile limits. Although the language is, "there is hereby granted * * * all the swamp-lands belonging to this state, lying and being within the limits," etc., still the act goes on to provide that as each section of twenty miles is located, "the said lands within

the limits aforesaid shall be withheld from market and sale,"
clearly indicating that, until location, the state may sell
or otherwise dispose of even lands "hereby granted." And
upon the completion of each section of twenty miles, "the said
lands within said limits shall be certified and conveyed to the
said company by the governor of the state." This of course
refers to the "said lands" which have been so withheld from
market and sale—that is, the lands not disposed of before loca-
tion of the road, such location being the first of the conditions
precedent to be performed by the company. The state promised
to certify and convey to the company such lands, within the
seven-mile limits, as should not have been disposed of at the
date of the location,—not such as the state owned at the date
of the act. The act further provides that whenever, upon the
completion of any twenty-mile section, it "shall be found that
any portion of the said swamp-lands within the said seven
miles have been sold or otherwise disposed of by the United
States or this state, the amount shall be made up and supplied
to said company out of swamp-lands belonging to the state, to
be selected by said company outside of said limits." Now if
the state could thus sell or dispose of any of the swamp-lands
before the location of the road, she could sell or dispose of
those which afterwards proved to be outside, as well as those
which proved to be inside the limits; for until the location, it
could not be known what lands would prove to be outside and
what lands inside the limits of a possible location; and if the
state, before the location of the road, could dispose of lands
which, upon the location, proved to be outside the limits, she
could certainly continue to do so afterwards, for it is only the
lands within limits which are to be withdrawn from mar-
ket and sale, upon the location of the road. The plaintiff's
claim is that the act of 1863 gave it a prior right to select.
from all swamp-lands then belonging to the state, and pre-
cluded the state from interfering with this right by any dis-
position of any of her swamp-lands; and as all the lands, on
plaintiff's theory, stand on the same footing in this respect,

if its claim fails as to any lands, it must fail as to all.   As to the lands proving to be within the limits, the state evidently retained the right of disposition until the location of the road. Up to that time the state retained the same power over lands outside the limits, and there is no ground for saying that upon the location of the road she lost the right of disposing of these outside lands, upon which the only effect of the location was to show that they were outside of the limits, and therefore could not become the property of the company except by actual selection.   And between the date of the passage of the act, and the date when any lands might be selected by the company as indemnity lands, there is no point of time at which it can be said that the state's right of disposition, which certainly existed after the passage of the act, ceased and determined as to such outside lands.

And it is not to be supposed that the state would tie herself up from disposing of lands to which the company could acquire no right except upon the performance of conditions, and the happening of a deficiency, and a consequent selection, when she retained the liberty of disposing of all her lands before location of the road, although such mere location would entitle the company to have the lands within limits withdrawn from market and sale.   It is not to be supposed that when the state said that after the performance of conditions and selection made, "said lands so selected   *   *   * shall be certified and conveyed to said company by the governor of the state," she intended to pass to the company a greater right in, and to retain for herself a less power over, these lands, than over the lands within limits, as to which the language is, "there is hereby granted."   If the words, "there is hereby granted," did not preclude a sale or other disposition before location, still less did the words, "shall be certified and conveyed," preclude such sale or other disposition before selection.

And even if none of the provisions quoted were contained in the act of 1863, it is in the last degree improbable that

the legislature intended by that act to deprive the state of all interest in and all power over any of her swamp-lands, until the railroad company should build the road, which it did not agree to build at all, and which it was given five years to complete—a time afterwards extended to nine years—and until, after that time, the company should see fit to select all the lands to which it might become entitled. Even in the case of a private person, whose language would perhaps be construed *fortius contra proferentem*, such a construction as that claimed by plaintiff would not be allowed; *a fortiori*, in the case of a promise by the state. And this is not an argument against an unambiguous contract, based on the inconvenience of performing it. The argument goes to the construction of the act, and it is well settled that all such acts should be most strictly construed against the grantee. *Rice* v. *Railroad Co.*, 1 Black, 358, 380; *Dubuque & Pacific R. Co.* v. *Litchfield*, 23 How. 66; *Gildart* v. *Gladstone*, 11 East, 675; *Leavenworth, etc. R. Co.* v. *United States*, 92 U. S. 733, 740; Opinion of Attorney-General Black as to the Des Moines River Improvement Grant, 1 Lester Land Laws, 503.

It is argued that the reservation by the state of a power of disposition over her swamp-lands would be invalid, as repugnant to the grant contained in the act of 1863, and that the reserved right of disposition must be confined to a sale by tracts in the market, pursuant to some general system established by law. But the act itself contains no such restriction of the power of disposition, and it might as well be argued that as nearly all the prior grants of swamp-lands by the state had been floating grants in aid of railroads, therefore the previous legislation showed that it was the settled policy of the state to devote her swamp-lands to railroad-building, and consequently the words "sold or otherwise disposed of" must mean not sold in market, but sold or disposed of to railroad companies.

It seems to be assumed that the reservation of the power to sell by tracts in market would be less repugnant to the

supposed grant to plaintiff's predecessor than would be the reservation of the power of disposing of them in the manner in which the disposition has been actually made; but why this should be so is not apparent. In the case of a present grant of specific land by an individual, either reservation would be repugnant in a common-law conveyance. But even a private person, in an executory contract or a mere naked promise to convey a quantity of land, to be selected from a much larger quantity after the performance of certain conditions, may retain the right of disposition over the property until performance of the conditions and selection made. This would simply make the contract an agreement to convey lands to be selected from lands undisposed of at the time of selection. So far from being repugnant to the agreement to convey, it would form an integral part of such agreement. It would be, in effect, a part of the description of the lands forming the subject-matter of the contract.

Moreover, an act like that of 1863, if a grant at all, is not merely a grant but a law; and if it contains provisions inconsistent with the common law or statutes regulating the conditions or restrictions that may be annexed to conveyances, the act is itself a repeal *pro tanto* of such common-law or statutory rule. And, if that act contains a reservation clearly inconsistent with the claim made by plaintiff under it, and such as in effect nullifies the act as construed by plaintiff, then, under the rule of construction laid down in the cases already cited, the reservation must have full force and the alleged grant itself fail, unless it can receive a construction consistent with the reservation. Such a construction we offer, a construction which gives effect to the whole act.

But if it were otherwise, and if the state is subject to all the rules which govern the conveyance by individuals, it would seem that the act of 1863, if a grant, must be invalid, as suspending, for a period not measured by the duration of two lives then in being, the absolute power of alienation of the swamp-lands of the state.

If plaintiff's claim were rested solely on the act of 1863, it must fail, for no part of the railroad was completed or even begun within the time limited by that act. The plaintiff is therefore compelled to invoke the aid of the subsequent legislation detailed in the complaint, extending from time to time the limits fixed by the act of 1863, and relieving the company from a strict compliance with its conditions, the first of these acts being that of March 2, 1865. Sp. Laws 1865, c. 6. But before the passage of any of these acts, the act of February 13, 1865, (Laws 1865, c. 5,) was passed, under which and the act of March 2, 1866, (Laws 1866, c. 6,) and the proceedings thereunder, the trustees defendants derive title to the lands in question.

The act of 1865 was a solemn declaration at once of the right and the intention of the legislature irrevocably to dedicate and set apart a very large amount of swamp-lands, in even-numbered sections, for the purposes of education and charity. On March 2, 1865, only seventeen days after this clear and public declaration of the right and purpose of the state in the future disposition of this portion of its swamp-lands, the legislature granted the application of plaintiff's predecessor for relief from the conditions of the act of 1863. It is not to be supposed that by the latter act the legislature intended to prejudice the rights of the various institutions named in the act of February 13th—that when the ink was hardly dry on the act of February 13th, the legislature would deliberately nullify its provisions, and revoke that irrevocable dedication. If such had been the purpose of the legislature— if it had been intended to subordinate the great public interests of charity and education to the demands of the projectors of a railroad, which, so far as the complaint shows, did not then exist even on paper—that purpose would surely have been expressed in unmistakable terms, and would not have been left to be inferred from general provisions extending the time for the grading and completion of the many different lines and branches of the St. Paul & Pacific railroad.

And not only is it clear that the legislature did not intend, by the act of March 2d, to repeal or qualify the act of February 13th, but it is also manifest that the St. Paul & Pacific Company applied for and obtained the favors granted by that act, with full knowledge of the purpose of the state to devote her swamp-lands to endow her public charities. The company is legally presumed to have known, and as a matter of fact it could not have been ignorant of the provisions of the act of February 13th. That act was not private or special. It was not done in a corner. It was a public and general law, on a subject of great public importance, and it concerned, moreover, the very swamp-lands in which the company hoped at some time to acquire a large pecuniary interest. At that time the company had acquired no rights whatever under the act of 1863. It was wholly at the mercy of the state. It had done nothing to convert the gratuitous promise of the state into a binding contract. In this condition of things it must be held that the favor which the company sought, and which was extended to it by the act of March 2d, was granted by the state without prejudice to her right to fulfil the pledge contained in the act of February 13th, and was asked and accepted by the company as not prejudicial to or inconsistent with such declared purpose of the state. The right of the company, therefore, on compliance with the act of March 2d, and subsequent acts, to an endowment from the swamp-lands of the state, must be held subordinate to or at most co-ordinate with the rights of the state institutions, in the even-numbered sections; and the promise of swamp-lands to the company must (so far as the rights of these trustees are concerned) be treated as if made, not on March 6, 1863, but on March 2, 1865, and subject to the act of February 13th. In short, the legislation of the year 1865, relative to the swamp-lands, should be regarded as a whole, for thus only can we arrive at the true intention of the legislature in its dealings with the hospital and the company.

But whatever view may be taken of the legislation of 1865,

and its agreement or disagreement with the act of 1863, it is entirely clear that by the act of February 13th the legislature intended to devote the even-numbered sections of her swamp-lands to the endowment of her institutions of charity and education; and it is equally clear that the state had full power thus to dispose of the lands in question, unless she was disabled from so doing by some existing contract with the company. But the act of 1863 contained no contract whatever in regard to these lands or any lands. That act involves no present grant. It is wholly promissory in its intent, and, so far as the indemnity lands are concerned, there is no question but that its terms are strictly promissory. "Shall be made up and supplied," * * * "shall have the right to and may select," * * * "shall be certified and conveyed to said company,"—these are the words used. These are words of promise. If there were a consideration to support it, they would be words of contract. But no consideration is stated in the act; no consideration is alleged in the complaint; the inference from plaintiff's argument and the cases cited by him in regard to the conditions of the act is that there was no consideration, and as matter of fact there can be no doubt that when the act of 1863 was passed there was no consideration whatever, of benefit to the state or detriment to the company, to support the promise contained in it. The only consideration for the promise that could be imagined as existing at the passage of the act, would be the agreement or obligation of the company to perform the conditions of the act. But the company did not agree and was under no obligation to perform these conditions, or to build, or even to locate the road. No such agreement or obligation is alleged in the complaint, or contained in the act. The words imposing the conditions are strictly words of condition and not of covenant. They are so treated in the argument for plaintiff, although erroneously assumed to be conditions subsequent. Like words are held to import a condition and not a covenant in *Nicoll* v. *N. Y. & Erie R. Co.*, 12 N. Y. 121, cited

by plaintiff's counsel, and in *Sharon Iron Co.* v. *Erie*, 41 Pa. St. 341, although both of these were cases of grants *in præsenti*, and the conditions were subsequent and not precedent. We have then in the act of 1863 a mere naked promise by the state that plaintiff may do and receive certain things, on performance of certain conditions precedent within a certain time. Clearly up to this point there is no consideration whatever for the promise. *Bailey* v. *Austrian*, 19 Minn. 535. When the company, relying on the promise, begins the performance of the conditions, then, we concede, (although *Bailey* v. *Austrian* is perhaps an authority to the contrary,) a consideration arises, and attaches to the promise, and what was before a mere naked promise, a nude pact, is then first clothed with an obligation and becomes a perfect contract. *Great Northern Railway Co.* v. *Witham*, L. R. 9 C. P. 16.

But until the company at least actually began to perform the conditions of the act of 1863, that act was wholly within the control of the legislature. It might be repealed altogether. The range of selection might be limited to the odd-numbered sections. In short, as there was no contract, no action by the legislature could be invalid as impairing the obligation of contracts. But the complaint fails to show that a single step had been taken by the company toward the performance of the conditions of the act of 1863, till after the passage of the act of February 13, 1865. At that date it does not affirmatively appear (and the contrary appears by implication) that the company had constructed a mile of its road, or that it had even located a mile of its road, or that it had ever done anything whatever to signify its acceptance of the act of 1863, or that it had in fact ever accepted that act. Therefore, when the act of February 13, 1865, was passed, there was nothing in the act of 1863, or in anything that had been done under it, which constituted a contract between the state and the company, or which imposed any restraint whatever upon the absolute power of the state to dispose of her swamp-lands as

she saw fit; and whether the act of 1863 is to be construed as consistent with the act of February 13th, or whether the latter act must be construed as a repeal or modification of the former, there can be no question of the *power* of the state to provide for the disposition of her swamp-lands in the manner in which she very clearly provided for their disposition by the act of February 13th. That act being thus clearly constitutional, and being the later expression of the legislative will, the promise held out by the act of 1863 must be limited to such lands as should not have been disposed of under the provisions of the latter act.

Moreover, the company, which, down to the time of the passage of the act of February 13th, had taken not one step in the performance of the conditions of the act of 1863, applied for an extension after the terms of the promise had been (as we now assume) modified by the act of February 13th; and everything that has been done by that company or plaintiff, in reliance on any promise by the state, was done after the modification of the promise effected by that act; and the contract which, by reason of the performance of the substituted conditions, now subsists between the state and the plaintiff, is founded not on the promise of the act of 1863, but on that promise as modified by the act of February 13, 1865. So far, then, is that act from impairing the obligation of contracts, that it forms a term in the very contract on which the plaintiff must base its claim to these lands.

3. By the acts of February 13, 1865, and of March 2, 1866, and the subsequent proceedings thereunder, detailed in the complaint, the title in fee to the lands in suit vested in the trustees defendants upon the trusts specified in those acts, and such lands were no longer open to selection by plaintiff.

On compliance with the terms of the act of 1863, the plaintiff might select from such lands as should not then have been otherwise disposed of. If the mere nude, conditional promise to the company in the act of 1863 is to be regarded as a present disposition of any lands, then the absolute prom-

ise in the act of February 13, 1865, to convey lands in the even-numbered sections to the trustees of the hospital, must, *a fortiori*, be a disposition of lands, and must be a revocation of the former disposition, so far as lands in the even-numbered sections are concerned. In such case it is evident that the plaintiff could have no claim to any land in the even-numbered sections till the 100,000 acres for the hospital had been selected and set apart to it. But the act of 1863 was not of itself a disposition of any lands, but a mere promise of a future disposition, and it is perhaps the more correct view of the act of February 13, 1865, to regard it not as a present disposition, but as merely providing for a future disposition. In this view of these acts, each contemplates a future disposition, the one of an ascertained and the other of an unascertained quantity of lands, to be selected, the one an absolute disposition, the other a disposition depending on the performance of conditions precedent; and until selection actually made, neither the selected lands nor any lands can properly be said to have been disposed of by the state. When selection is made, then a disposition is effected. But the selection for the trustees was prior in time to the selection by the plaintiff, and therefore the plaintiff has no claim to the lands in question, because they had already been disposed of by the state before they were selected by plaintiff.

By the acts of 1865 and 1866, the trustees of the hospital were created a corporation, to which the state could make a grant and which was capable of receiving a grant from the state. *Mahony* v. *State,* 4 Ark. 620; *Bank of So. Car.* v. *Gibbs,* 3 McCord, 377; *Lord* v. *Bigelow,* 8 Vt. 445; *Trustees of University* v. *Winslow,* 5 Stew. & Port. 17; Angell & Ames, §§ 77, 78.

And it is, perhaps, the more correct view of the *status* of the trustees to hold that they are a public corporation, created to fulfil functions wholly public, devolved upon it by the sovereign. And the plaintiff's claim is that because they are such a corporation, and such a corporation is the mere crea-

ture of the state, and may be dissolved and its property resumed by the state at pleasure, therefore the trustees cannot hold the lands in question as against the state; and although the state has not attempted to resume her grant, she is and always has been the owner of the lands, subject to plaintiff's right to a conveyance, and the trustees have no title to them as against the plaintiff.

But from the power of the state to revoke the grant and become the owner of the lands it by no means follows that she is already the owner of them before any revocation. Nor does it follow that the trustees 'have no title as against the plaintiff. One may well have a title to lands or other property good as against third persons, though wholly invalid as against the sovereign. Thus there are many cases in which corporate franchises have been sustained as against individuals questioning them, though they could not stand against a *quo warranto* at the suit of the state. So it has often been held that private persons, having no title or claim to public lands as against the United States, may yet have rights and interests therein valid as against third persons, claiming under floating grants or otherwise. See *Shepley* v. *Cowan*, 91 U. S. 330, 338; and compare *Yo Semite Valley case*, 15 Wall. 77; *Frisbie* v. *Whitney*, 9 Wall. 187. So in case of a grant in fee to a private person on condition subsequent which has been broken. Though the grantor may re-enter and defeat the estate granted, yet until re-entry the grantee's estate and title are good as against the world, and the grantor has no estate or interest in the property. *Nicoll* v. *N. Y. & Erie R. Co.* 12 N. Y. 121; and see *Schulenberg* v. *Harriman*, 21 Wall. 44.

And so in regard to the lands held by a municipal or other public corporations upon public trusts. Like these trustees, such corporations are the creatures of the state, and exist and hold their property and franchises at the mere will of the legislature. The state may at any time dissolve them, and upon or without such dissolution, she may divest them of all title to any lands so held. In short, the power of the legis-

lature over such corporations is "supreme and transcendent." *East Hartford* v. *Hartford Bridge Co.* 10 How. 511, 534, etc.; *Bass* v. *Fontleroy*, 11 Texas, 698; *People* v. *Vanderbilt*, 26 N. Y. 287; *Darlington* v. *The Mayor, etc.* 31 N. Y. 164; *Philadelphia* v. *Fox*, 64 Pa. St. 169; 1 Dillon Mun. Corp. §§ 31–40; Cooley Const. Lim. 238.

And even where a city is trustee of a charity under the devise of an individual, the state may radically change the corporation, (*Vidal* v. *Philadelphia*, 7 Wall. 14,) or she may herself assume the execution of the trusts, or she may by legislative act divest the city of its legal estate, and vest the legal estate in a different trustee, upon the same trusts. *Philadelphia* v. *Fox*, 64 Pa. St. 169; Dillon Mun. Corp. §§ 37–47, and cases; § 437; Cooley Const. Lim. 279 and note.

As to the power of a state to resume lands granted by it to a city in trust for public use, before the trust has been executed, see *Bass* v. *Fontleroy*, 11 Texas, 698; *People* v. *Vanderbilt*, 26 N. Y. 287.

There is yet a closer analogy between the trustees of the hospital and a county in respect to the lands held by them on public trusts. Counties are created by the state of her own sovereign will, without the particular solicitation or consent of the people who inhabit them. They are created and organized for state purposes, and with a view to the policy of the state at large, for purposes of political organization and civil administration. With scarcely an exception, all the powers and functions of the county organization, have a direct and exclusive reference to the general policy of the state, and are in fact but a branch of the general administration of that policy  *Com'rs of Hamilton Co.* v. *Mighels*, 7 Ohio. St. 109; *State* v *McFadden*, 23 Minn. 40. Hence arises the familiar distinction between a county and a city in respect to liability for defective highways, etc.

It is true that the trustees are appointed by the state, but so were the county commissioners and other county officers, in former days, in Massachusetts and other states. It is also

true that the functions of the trustees are devolved upon them for purely state purposes; but so are those of the county officers, though the latter exercise their functions only within the limits of the county; and this difference does not affect the question under discussion. If instead of one hospital and one board of trustees for the entire state, the state were divided into three districts, with a board and a hospital for each district, each hospital appropriated to the sole use of the inhabitants of the district in which it was located, and each board being appointed in the same manner, and clothed with the same powers and duties, as the single board now existing; still, so far as concerned the title to the lands held for the hospital, each board would stand on precisely the same footing as the present board. The resemblance between each of such boards and a county, in its relation to the state, might, perhaps, be more striking, but it would not be more real, than the resemblance between the present board and a county; and it could not be held that any one of such three boards would have no title to the lands so held by it, without holding also that the counties of the state have no title to the lands so held by them, and that the real title to such lands is in the state.

But even if the state has all the while been and still is the owner of these lands, still they are not open to selection by plaintiff. As already shown, the act of February 13, 1865, must, if inconsistent with the act of 1863, be held to be a modification of the promise contained in that act. The act of February 13th certainly assumes to provide for devoting 100,000 acres of land to the hospital, and that disposition of the lands in question has been effected by the proceedings already had under the act. The necessary effect of the act of 1865 and these proceedings was, therefore, to withdraw these lands from the body of lands out of which plaintiff could select; for the state made its promise to the company subject to all the provisions of the act of February 13, 1865,

whether those provisions were consistent or inconsistent with the act of 1863.

It is urged that the endowment of the hospital was to be out of swamp-lands "not otherwise disposed of prior to the passage of this act," and that this clause shows that it was the intention of the state to dedicate to the state institutions the "remnant" of her swamp-lands, after the demands of plaintiff and other companies were satisfied. But at the passage of this act neither the lands in question nor any lands had been disposed of to the plaintiff or its predecessor. The state had merely promised such a disposition on conditions which the company had not attempted to perform. Moreover, it does not appear what, if any, swamp-lands had been in fact disposed of at the date of the act under former promises, whether absolute or conditional, for future disposition of lands; nor does it appear what if any knowledge the legislature had of the steps taken (if any had been taken) by the plaintiff or the Lake Superior Railroad Co. to locate its road, and thereby identify the lands within the seven-mile limits fixed for each road. And it is attaching altogether too much importance to these words to permit them to operate either as a disposition, or as a recognition of an existing disposition, of the lands in question to the company. The words are such as are almost invariably used in similar acts, and, like the words in appropriation bills—"out of any money in the treasury not otherwise appropriated"—do not necessarily import that any such other appropriation has as yet been made.

And so of the provisions in case of a deficiency of lands. So far as appears, no lists or plats had been furnished the state at the date of the act, nor does it appear whether the legislature had any knowledge whatever of the probable amount of swamp-lands for which the state would receive patents under the act of congress. When railroad companies applied to the legislature for acts like that of 1863, they took their chances of finding lands enough to make up the quantity promised; but when the state was providing for an endow-

ment of several institutions from one source, it was natural and proper to provide for a possible deficiency; and the fact of such provision has no tendency to show that the legislature considered such a deficiency probable; still less is it an argument that the legislature feared that a deficiency might be found in consequence of any prior right of plaintiff's predecessor to the unascertained quantity of land to which it might some day become entitled on performance of the conditions of the act of 1863.

4. Under the act of 1863, the plaintiff can select indemnity lands enough to give it seven sections per mile, and no more, in each twenty-mile section.

The antecedent probability is very strongly against the construction insisted on by plaintiff. Its claim assumes that the legislature intended to give it all, or the equivalent of all the land within the limits. Such a gift to a railroad, of all the land in a belt of fourteen miles along its line, would be wholly without precedent, the alternate sections being all that are ever given, unless (as in this case) land of a special description is given, which could not comprise more than half the lands within. limits.

In the next place, the claim of plaintiff finds no support in the act itself, taken as a whole. The natural and obvious meaning of the clause "if   *   *   *   there shall not be an amount of swamp-lands on each side of said line   *   *   * equal to at least seven full sections per mile of said road" is, if the swamp-lands on each side of the line, *i. e.* on both sides, shall not be equal to seven full sections per mile. The "amount of swamp-lands on each side of said line" is the exact equivalent of the "amount of swamp-lands on both sides of said line." The whole clause means the same as if it read, "if   *   *   *   within the said seven miles on each side of said road, (*i. e.* within the seven-mile limits,) there shall not be an amount of swamp-lands equal to at least seven full sections per mile of said road."

The plaintiff's construction overlooks the force of the words

"at least." If plaintiff is to be guaranteed an amount of swamp-lands equal to seven sections per mile in a strip fourteen miles wide, then the words "at least" are appropriately used. But if plaintiff is to be guaranteed an amount within limits equal to fourteen full sections per mile, *i. e.* equal to all the land within limits, the words "at least" are worse than meaningless. To guarantee that in a strip fourteen miles wide there shall be at least fourteen sections of swamp-lands per mile, implies that there may be more; *i. e.* that within the limits more than all the land therein contained may be swamp-lands.

Nor can plaintiff rely on the joint resolution of 1873, in support of its claim to fourteen sections. It is not competent for one legislature to act judicially in the construction of an act of a former legislature, nor is the state bound by any such construction. Moreover, the reference to the plaintiff's grant as containing fourteen sections is found only in the preamble. The preamble of an act or resolution is no part of it, and is without legislative force. It is merely evidence, not that the recital was true or that the legislature had inquired into it and found it to be true, but merely that the facts were so represented to the legislature. Sedgwick Const. Law, 57. The plaintiff cannot convert its own representations into legislative recognition of its claim.

5. The governor of Minnesota is not a proper party defendant, for as to him the court has no jurisdiction, and the com plaint fails to state a cause of action.

On plaintiff's own showing, this action is brought, not against the state of Minnesota, but merely against the trustees of the hospital. The governor, therefore, should not be made a party unless the plaintiff has some cause of action against him distinct from a cause of action against the state. But no such cause of action is stated. The grievance alleged is that the governor has refused to execute on behalf of the state a deed to which plaintiff thinks itself entitled, and which it thinks he ought to have executed; but the com-

plaint wholly fails to show any right of the plaintiff to such conveyance. It is said on the authority of a special term decision in *Manning* v. *Nicaragua*, 14 How. Pr. 517, that the governor, though not a necessary, is a proper party defendant; but it is difficult to see how one can be a proper party defendant, against whom the complaint states no cause of action.

And even if on the facts stated the plaintiff were entitled to a conveyance of these lands, this court has no power to give it any relief against the governor, still less to grant the alternative relief prayed in the complaint. The governor of Minnesota, as the chief executive officer of the state, is not justiciable in any of her civil courts. The ground of decision in *Rice* v. *Austin*, 19 Minn. 103, was that to compel the governor to make a conveyance would be an indirect usurpation by the court of the powers vested in the executive department. Yet the court is now asked to do directly what it refused in that case to do indirectly, and to make a decree which shall of itself operate as an executive act of the governor,—which would be a direct usurpation of executive power. As well in an action for money, brought against these trustees and the auditor, might the plaintiff ask that the judgment of the court should stand as an appropriation by the legislature and a warrant on the treasury.

It makes no difference that the legislature has authorized this suit against the governor. An invasion of the executive department by the combined forces of the legislature and the courts is as flagrantly unconstitutional as an invasion by either one of them.

*Appellant's Counsel, in reply.*

The third section of the act of congress of September 28, 1850, provides, as the criterion of swamp-lands, not their character as being wet or dry, but the situation of the boundary lines of the legal subdivisions, as the same should be located on the ground by the official survey, with reference to the boundaries of the wet lands.

The doctrine that the swamp-land grant to the state was a

present grant does not rest on the ground that the act contains a good description at common law, but upon the well-settled doctrine that the state, by legislative act, may vest in a grantee a present title to lands to be identified in the future. Such grant, being also a law, operates, regardless of the principles of the common law, according to the intent of the legislature. And there is no reason why a condition subsequent may not be annexed to such floating title, if such was the intention of the legislature. The latest exposition of the law on both these points is found in *Schulenberg* v. *Harriman*, 21 Wall. 44, 61, and is based not on any proceeding had under the act in question in that case, but on the act itself. In that case a condition like that in the act of 1863 was held to be subsequent and not precedent. The cases of *Smith* v. *United States*, 10 Pet. 326, and *Fremont* v. *United States*, 17 How. 542, are not adverse to this doctrine, which is fully sustained by *Leavenworth, etc. R. Co.* v. *United States*, 92 U. S. 733; *Central Pacific R. Co.* v. *Dyer*, 1 Sawyer, 641; *Dequindre* v. *Williams*, 31 Ind. 444; *Gaston* v. *Stott*, 5 Oregon, 48; *Johnson* v. *Ballou*, 28 Mich. 379.

There is no ground for any distinction as to the character of the right conferred by the act of 1863, between the lands in place and the deficiency lands. The only difference is in the acts to be done to give precision to the grant. The granting words in the first part of the act apply to all the lands affected by it, and the subsequent provisions, down to the proviso, are descriptive of the extent of the grant. The lands outside the limits are spoken of as lands to make up a deficiency. No provision is made for any future grant of these lands, which would be necessary if, as to them, the act were a mere contract to convey. The words, "shall be certified and conveyed to said company by the governor of the state," are used as well with reference to the lands in place as to the deficiency lands. With respect to the former, such conveyance does not pass the title, but is merely evidence of it; and where words have a well-defined meaning in one part of

an act, there is no reason for giving them a different meaning in the subsequent part of the same act. The language of the proviso, that in case of breach of condition, "all the lands hereby granted," appertaining to the unbuilt portion of the road, are to be forfeited, refers to deficiency lands as well as to lands in place; for it cannot be that the lands in place should be forfeited in case the road should not be built within the time limited, but, upon the subsequent building of the road, the company should have the right to select and have a title to the deficiency lands.

No particular form of words is needed in a legislative grant. In *Rutherford* v. *Greene's Heirs*, 2 Wheat. 196, the words "there shall be allotted," and in *Bridge Co.* v. *Kansas Pacific R. Co.*, 12 Kans. 409, the words, "the president shall set apart," were held to constitute a present grant. Similar language to that of the act of 1863 is used in congressional land grants with reference to deficiency lands, and the state has always been held to have the same rights, and acquired the title in the same manner, to the lands in place and the deficiency lands. Opinion of Secretary of Interior, 1 Lester, 523.

The fact that the lands in question were set apart by the auditor under the act of 1865 before plaintiff selected them under the act of 1863, has no bearing on the rights of the parties. Where there are two floating grants, and an insufficiency of lands to fulfil both, the elder grant must prevail. *Bissell* v. *Henshaw*, 1 Sawyer, 553, (where two locations overlapped each other, and the grant first in point of time prevailed, though the junior grant was first located,) and *Sherman* v. *Binck*, 45 Cal. 656, (where the title of the state to a school-section under the act of 1853 was held superior to that of a pre-emptioner who entered the land in 1862, and regularly received a patent, the land not having been surveyed and ascertained to be a school-section, until 1866.) No such case was under contemplation in *Fremont* v. *United States*, 17 How. 542, and no such question arises here, for the act of 1865, as

construed by defendants, operated of itself as an absolute and immediate withdrawal of 500,000 acres of land from the operation of plaintiff's contract. The setting apart by the state auditor, though acts to be done in the future, were official acts requiring absolutely to be done, and, being done, they precluded plaintiff from attaching its title to any lands so set apart. The act did not invite plaintiff to a race of diligence, but made diligence of no avail. It was, on defendants' construction, purely an attempt to take 500,000 acres from out the operation of plaintiff's grant. It could not have vested any right in any third party at the time of its passage, for there was no hospital, and of course there were no trustees, then in existence.

The act of March 2, 1865, being a mere extension of the time for performing a condition, cannot be construed as modifying the terms of the contract under the act of 1863, so as to make it subordinate to the act passed on February 13, 1865. If the legislature of 1865 had intended by the act of February 13th to impair the plaintiff's land grant, and to make the extension of time in the act of March 2d conditional on the subordination of the railroad grant to that of the state institutions, the latter act would have so provided—and the road would never have been built.

But whether the act of 1863 be treated as a present grant or as an executory contract, it is in either case a binding obligation of the state that the company, in consideration of the building of the road and the consequent public benefit, shall have from the state the full quota of fourteen sections of swamp-lands to the mile of road. The defendants claim that the plaintiff should have the lands in place if the state should not have disposed of them before location of the road, and enough other lands to make up its quota, if the state should not have disposed of them,—and this on the ground that the act does not in express terms prohibit the legislature from disposing of all the swamp-lands to others.

But the state certainly intended to give or promise the com-

pany something for building the road.    The professed purpose
of the act, to aid the construction of the road, was not in-
tended to be effected by giving no aid.    There can be no rea-
sonable doubt that the amount of aid intended to be given
was intended to be specified in the act, and not left to the
mere will of the state—the expressed object of the act being
to aid an enterprise deemed of public importance, and thereby
to induce the company, from their private means, to under-
take and accomplish it.  If the construction claimed by defend-
ants had appeared on the face of the contract, no one would
have put a dollar into the railroad on the strength of it, and
the professed object of the act would have failed.    Such being
the intention of the act, the state had no right to deprive itself
of the power of fulfilling its contract by subsequently granting
the lands to others; and such grantees are chargeable with
knowledge of plaintiff's contract rights, and could acquire no
rights against it.

If the legislature could withdraw 500,000 acres in even-num-
bered sections from the operation of plaintiff's contract, it
might withdraw all the even and all the odd-numbered sec-
tions.    It had the same power to destroy as to impair the con-
tract, and this is conceded by defendants, who are thus driven
to deny that there ever was any contract between the state
and the plaintiff.    The state can no more revoke its grants
than the donor his gift when delivered, and this whether the
grant be of a franchise, land, the right to acquire land, or any
other valuable thing.  *Dartmouth College* v. *Woodward*, 4 Wheat.
518; *Fletcher* v. *Peck*, 6 Cranch, 87; *Derby Turnpike Co.* v.
*Potts*, 10 Conn. 522, 541.    Under the circumstances of this
case it must be presumed that plaintiff's predecessor accepted
the grant of 1863, and no averment of that fact was necessary.
*Johnson* v. *Ballou*, 28 Mich. 379; *Rathbone* v. *Tioga Nav. Co.*,
2 Watts & Serg. 74; *Bank of U. S.* v. *Dandridge*, 12 Wheat.
64, 70; *Koenig* v. *Omaha & Northwestern R. Co.*, 3 Neb. 373,
in which a line of argument much the same as that of defend-
ants in this case, was rejected by the court.

If the act of 1863 is to receive as against the plaintiff the harsh construction claimed by the defendants, a real and substantial disposition by the state must be shown. Whatever disposition was effected by the act of February 13, 1865, was effected by the act itself and immediately on its passage, and the rights of the parties were fixed at that time. If these lands had been selected and set apart under that act before the establishment of the hospital under the act of 1866, there would have been no such real disposition of the lands so selected and set apart, for no third person would have acquired any rights as against the state or the company. The act provides, not that the lands to be set apart are to be used for anybody's benefit, but that they shall be sold and the proceeds applied to a public use. The power of disposition remained in the state as fully as if they had not been set apart. The act of 1866 gives the trustees no power to dispose of any lands. They are simply authorized to take and hold lands; and it cannot be said that the lands set apart after the creation of the board of trustees have been sold or disposed of to the trustees, when the trustees have not even a power of sale, and the state has the sole power of disposition—a power reposed, by the act of 1875, in the land-commissioner. It is evident that the intervention of the trustees in this matter is merely part of the machinery of the government, and their connection with the title, as public officers, does not in the least obviate the necessity of further legislative action before the lands could be in fact disposed of. The actual ownership of the lands remained in the state, and hence the necessity of the joint resolution giving jurisdiction to the court and making its judgment binding on the state. The opinion of Attorney-General Cornell, cited by defendants, was given on a question between the plaintiff and the Southern Minnesota Railroad Co., and in a subsequent opinion, given on December 31, 1870, (MS. Vol. of Opinions, ——,) on this very case, he recognizes the distinction between the two cases.

GILFILLAN, C. J.* The case comes here upon appeal from an order sustaining demurrers to the complaint.

The complaint alleges the corporate existence of the plaintiff, and that it is the company mentioned in the joint resolution of the legislature of March 11, 1873, "To facilitate the settlement of the title to swamp-lands heretofore granted by the state of Minnesota to state institutions and railroads."

The defendant Davis, when the suit was brought, was governor of the state, and the other defendants, trustees of the Minnesota Hospital for Insane.

The complaint alleges the corporate existence of the St. Paul and Pacific Railroad Company, authorized to construct and operate a branch railroad from St. Paul to Winona, and to acquire, hold and convey lands, and that in 1867 the plaintiff succeeded to all its rights, powers, privileges, immunities, franchises and property appertaining to the branch from St. Paul to Winona. It then refers to the act of March 6, 1863, entitled "An act granting lands to aid the St. Paul and Pacific Railroad Company in the construction of their branch railroad from St. Paul to Winona," and to the acts of March 2, 1865, March 2, 1867, March 4, 1868, March 5, 1869, each extending the time for the original company, or plaintiff, to comply with the conditions of the land grant, and alleges the final completion of the road and the performance of such conditions.

It alleges that within the limits of seven miles on each side of its line from St. Paul to Winona, there were only 3,541 91-100 acres of swamp-lands, and that it is entitled to swamp-lands to be selected outside of said limits, to the amount of the deficiency of 919,338 9-100 acres, and that in all there have been certified to it by the governor only 112,032 10-100 acres. It then refers to the act of February 13, 1865, entitled "An act to appropriate swamp-lands to certain educational and charitable institutions therein named, and for the

*Cornell, J., did not sit in this case, having, as attorney-general, given an opinion on some of the points involved in it.

purpose of erecting a state prison," and alleges that on September 15, 1870, the commissioner of the state land-office selected and set apart for the Hospital for Insane 19,816 78-100 acres of swamp-lands, donated by congress to the state, and made a record thereof. It alleges that the entire amount of swamp-lands patented by the United States to the state is only 923,825 27-100 acres, and that the state, under grants prior to that to plaintiff, has disposed of 576,495 72-100 acres, and under grants subsequent to plaintiff's, including that by the act of 1865 to educational and charitable institutions, 136,520 65-100 acres, leaving undisposed of, 98,776 80-100 acres, which are liable to be set apart to the above institutions; and that all the swamp-lands in the state which have been surveyed, except an inconsiderable quantity, have been patented to the state; and that after it became entitled to do so, it selected, to make up the deficiencies in its swamp-lands, the lands set apart to the Hospital for Insane, and demanded a conveyance thereof, and the governor refused to convey. It prays that the title to the lands be determined and adjudged to plaintiff.

To this complaint demurrers were interposed on the part of the governor, on the grounds that the court has not jurisdiction over him, and that the complaint does not state facts sufficient to constitute a cause of action; and on the part of the trustees, on the grounds that the court has no jurisdiction of the persons or of the subject of the action; that plaintiff has not legal capacity to sue; that there is a defect of parties defendant; that the complaint does not state facts sufficient to constitute a cause of action. The demurrers were sustained.

The demurrer on the part of the governor was properly sustained, on the ground that the court has no jurisdiction over him. The duties of the governor sought to be enforced in this action are duties belonging to him as executive of the state, and not as an individual. *Rice* v. *Austin*, 19 Minn. 103. He is not subject to the control of the judiciary in the

performance of such duties, and no action or proceeding before any court will lie against him to compel such performance. Nor can the joint resolution of the legislature, referred to in the complaint, bring him under such control. The independence of each of the three departments of the government—the executive, legislative and judicial—rests upon the constitution, article 3, and cannot be affected by any legislative act, although it may be approved by the governor at the time it passes.

The same ground of demurrer taken by the trustees is not well founded. The exemption from control by the judiciary, on the part of the governor, does not extend to mere administrative agents, who are created, and their powers and duties defined, by the legislature. The courts may entertain suits against them as against any merely ministerial officers.

The subject-matter of the action is property belonging to the state, and the action, though nominally against the trustees, is virtually against the state, to determine its right in the property involved. The exemption of the state from actions by its citizens is not based on any constitutional provision, but merely on grounds of public policy. A waiver of such exemption does not trench upon the independence of any department of the government. There can be no doubt that the legislature may waive such exemption, nor that its consent to do so may be expressed by joint resolution, passed in the manner prescribed by the constitution, as effectually as in the more formal mode by bill. It is to matters of this character that section 12, article 4 of the constitution relates. The joint resolution of 1873 is an answer to the objection that the action is virtually against the state.

There is nothing in the ground of demurrer stated—that the plaintiff has not legal capacity to sue. Its corporate character and the purposes of its creation fully appear by the complaint. The capacity to sue and be sued, and to protect its rights and enforce its claims by judicial process is an incident to every corporation. That the plaintiff may hold these lands,

if they belong to it, appears from the complaint, and that it may sue to determine its right to them follows of course.

The ground of demurrer—that there is a defect of parties defendant—is based on the proposition that the state auditor, because he certified the lands to the trustees, should be made a party defendant. The auditor is not, and never was, in any way connected with the title to the lands, any more than an attorney to convey lands is, by virtue of that relation, connected with the title to lands to which he executes a conveyance for his principal.

The further proposition is made in the argument "that if the legal title to the lands is in the state the governor cannot be required by the court to convey, and no alternative decree will be rendered by the court when the court has no power to direct and insist upon both conditions involved in the alternative." Section 14, *c.* 75, General Statutes, provides, "The district court has power to pass the title to real estate by a judgment, without any other act to be done on the part of the defendant, when such appears to be the proper mode to carry its judgment into effect." A case in which the court has jurisdiction over the land, but has not, or for any cause cannot enforce, jurisdiction over the person to compel a conveyance, comes within this section, and so far as compelling a conveyance by the governor is concerned, that is this case. The consent of the state and service on the trustees in whom the nominal title is vested gives the court jurisdiction to determine such title.

These grounds of demurrer being disposed of, we come to the merits of the case involved in the ground of demurrer alleged—that the complaint does not state facts sufficient to constitute a cause of action. This ground of demurrer has been discussed by counsel with great ability, the arguments taking a much wider range than we deem it necessary to follow. The arguments are mainly directed to the right of the plaintiff to the swamp-lands certified by the commissioner of the state land-office to the Hospital for Insane.

The plaintiff bases its claim upon the act of March 6, 1863, (Sp. Laws 1863, c. 4,) entitled "An act granting lands to aid the Saint Paul and Pacific Railroad Company in the construction of their branch railroad from St. Paul to Winona." Section one—the granting section—reads, "That for the purpose of aiding in the construction of a branch railroad from St. Paul to Winona along the valley of the Mississippi river, there is hereby granted to the St. Paul and Pacific Railroad Company all the swamp-lands belonging to this state, lying and being within the limits of seven miles on each side of the line of said branch road from St. Paul to Winona as the same shall be located and constructed; and as soon as any twenty continuous miles of said branch road shall be located, and as often thereafter as any further twenty continuous miles thereof shall be located, the said lands within the limits aforesaid shall be withheld from market and sale; and as soon as any twenty continuous miles of said branch road shall be completed, and as soon and as often thereafter as any further twenty continuous miles thereof shall be completed, the said lands within said limits shall be certified and conveyed to the said company by the governor of the state. And if, when, and as often as twenty continuous miles of said branch road shall have been completed, with the cars running thereon, it shall be found that any portion of the said swamp-lands within the said seven miles have been sold or otherwise disposed of by the United States or this state, the amount shall be made up and supplied to said company out of the swamp-lands belonging to the state, to be selected by said company outside of said limits. And if, upon the completion of any twenty continuous miles of said road, as aforesaid, it shall be found that within the said seven miles of said line there shall not be an amount of swamp-lands on each side of said line, belonging to the state, equal to at least seven full sections per mile of said road so completed, then the said company shall have the right to and may select from the swamp-lands belonging to this state, outside of said seven-

mile limits, other swamp-lands in an amount equal to such
deficiency, and the said lands so selected by said company
outside of said seven-mile limits shall be certified and con-
veyed to said company by the governor of the state. And
the said lands shall not be subject to taxation until the same
shall have been sold and conveyed by the said company:
*provided,* that if the said company shall not, within three
years, construct and equip for business, with the cars running
thereon, at least twenty miles of said road, and the residue
thereof within five years from the passage of this act, then
and in that case all the lands hereby granted, appertaining to
the unbuilt portion of the said branch road, shall be forfeited
to the state."

On this act the defendants make, in substance, the follow-
ing propositions: (1) That it was not a present grant of the
lands involved in the suit, or of any lands whatever; that at
most it was a mere executory promise by the state to convey,
upon the performance by the company of certain conditions;
(2) that this promise does not involve an undertaking by the
state to reserve or retain any swamp-lands outside the seven-
mile limits for the company to select from when the right to
select should accrue, but merely permission to the company
to select from the swamp-lands which the state might have
after it had, in the meantime, made such disposition of such
lands as it pleased, by grant or otherwise; (3) that the
state had, before any right of selection accrued to the com-
pany, disposed of the lands held by the trustees defendants,
by vesting the title in them upon the trusts specified in the
act of February 13, 1865, and that when the company made
its selection, those lands did not belong to the state within the
meaning of the act of March 6, 1863; (4) that if the act of
March 6, 1863, was merely an executory promise to convey
on the conditions specified, there was no promise or under-
taking of the company to perform these conditions; that it
lacked the element of mutuality to make it a binding contract,
was therefore without consideration until the company should

v.24m—37

commence to perform the conditions, and until that time the state might, at any time, withdraw its promise.

The terms of the act are those of present grant. "There is hereby granted to, etc."   *   *   "All the lands hereby granted appertaining to the unbuilt portion of the said branch road shall be forfeited to the state."   Notwithstanding the difficulty of conceiving a grant which shall at once vest in the grantee the title, when the lands to which it is intended to apply are not known, acts of congress in the terms of this act have been held by the supreme court of the United States in a number of cases, and most distinctly in *Schulenberg* v. *Harriman*, 21 Wall. 44, to pass a present title, which, at first imperfect, acquires precision and becomes attached to specific lands as soon as the land is ascertained.   But upon the case presented we do not deem it necessary to decide the point; for the act is, if not a present grant, good as an executory contract to convey, even if it be conceded, that, as an executory promise on the part of the state, it was at first without mutuality of consideration, and for that reason might be withdrawn by the state before the company should do anything toward performing the conditions of the promise.   It could not be withdrawn without notice to the company.   No such notice appears from the complaint.   It appears that the plaintiff performed the conditions, and, so far as the complaint shows, that the state not only gave no notice of an intention to withdraw its promise, but that it never intended to withdraw it.

It is immaterial so far as concerns this controversy whether the act be considered a present grant or an executory contract to convey.   In either case it is equally binding upon the state.   In the latter case, the state could not rightfully defeat the right of the company, upon its performing the conditions of the act, to select and receive the lands intended by it.   We see no such intention on the part of the legislature.   The first section of the act of February 13, 1865, (Laws 1865, c. 5,) which is claimed to have defeated this right of selec-

tion, so far as concerns the lands held by the trustees, is as follows: "That as soon as the title to the swamp-lands donated by congress to the state of Minnesota shall become vested in this state, the commissioner of the state land-office shall, from the even-numbered sections of any such lands not otherwise disposed of prior to the passage of this act, proceed to select, or cause to be selected and set apart for the erection and support of an insane asylum, one hundred thousand acres of swamp-lands," and so for the other institutions. The power of the commissioner to set apart lands pertained only to those "not otherwise disposed of prior to the passage of the act." None of the lands referred to had as yet been ascertained and patented to the state, and they could have been disposed of prior to the passage of the act, and in advance of the title to them vesting in the state, only by grants similar to that to plaintiff. To save such grants was intended by confining the appropriation to state institutions to land not otherwise previously disposed of. The legislature did not intend to dispense its charities in the name of the state, but at the expense of those to whom it had made grants of swamp-lands. The commissioner of the land-office was, therefore, not authorized to set apart to the institutions named any swamp-lands except out of the surplus that should remain after prior grants and appropriations should be filled. And this was in strict accordance with honesty and good faith; for a contract by the state to convey to this plaintiff a designated number of sections of swamp-lands, and giving it the right to select, in order to make up deficiencies, from swamp-lands outside of the designated limits, involves the obligation on the part of the state to retain for such selection, if it receive them, enough of such lands to give effect to the right of selection.

The construction of the act of March 6, 1863, as to this feature, contended for by the defendants, is entirely inadmissible. On that construction the effectual right of selection would depend entirely upon the will of the state, for the

state would have the right to prevent it by disposing of the lands as fast as received. A contract by which the rights of one party, after performance on his part, would be at the absolute pleasure of the other would be an anomaly. It is true the act of 1863 implies that until the lands are ascertained inside of the limits by location of the line, and outside by selection, the state may keep them in the market for sale. This however, would be for sale in the ordinary course of the market, which could not seriously diminish the quantity of land, nor materially interfere with the plaintiff's right of selection, and it does not contemplate a disposition of them *en masse*, or any other disposition except by ordinary sale.

What would be the respective rights between the plaintiff and other grantees of the state in grants made subsequent to the plaintiff's, but completed by appropriation of the lands to them before a selection made by the plaintiff, leaving not enough for plaintiff to select from, we need not consider. The trustees do not stand in the position of such grantees. Beyond any question, they are merely agents or officers of the state, appointed to hold for it, and manage, the lands set apart for the hospital. The title is the title of the state, held for it by its agents or officers, as fully so as if the legislature, instead of appointing them for that purpose, had designated to perform the duties imposed on them the state auditor, or treasurer, or attorney-general, and had, for the more convenient performance of such duties, declared that the title to the lands set apart should vest in such officer. No one but the state has any interest in the lands or control over them, except such as it permits, and as its agents. The control of the state, both over the legal title and the use, is absolute, and it is the control of the owner.

There is no analogy in this respect between the trustees, though they are a corporation, and a city, county, or other corporation created for municipal purposes. Such corporation is, indeed, created by, and its existence depends upon, the will of the state, but it is created for the benefit of, and

is maintained by, not the whole state, but the people of a district, who are *cestuis que trust* of the property held by the corporation. The state has no interest in it or right of control over it, except as sovereign. The lands held by the trustees belong to the state, and are within the designation in the act of 1863, of lands from which the plaintiff may select to make up its deficiencies, and, having selected them, it is entitled to them.

Probably the most important question presented in the argument is, as to the amount of lands granted to the plaintiff by the act of 1863. The case might be decided without determining this, but each side wishes it decided, and the preamble to the joint resolution of 1873 seems to contemplate an action in which that question may be determined. We will therefore decide it. The plaintiff claims that the act granted fourteen full sections per mile. The defendants insist that it granted only seven full sections per mile.

The granting part of the act—that part in the section we have quoted—down to the words "governor of the state," first occurring, purports to grant to the company all the swamp-lands, more or less, lying within the limits of seven miles on each side of the line of road when located. The succeeding paragraph provides for giving to the company other swamp-lands in lieu of those which shall, at the time of such location, have been sold or otherwise disposed of within the limits, by the United States or state. Had the act stopped there, the whole amount of land to which the company was entitled would be measured by the amount of swamp-lands actually lying within those limits, and the amount which it might take outside of the limits by the amount disposed of within the limits, by the United States or state. In the construction of the act it is proper to observe that if it had been the intention to grant fourteen sections per mile, and no more and no less—and that is what plaintiff claims—the most obvious and natural way to have expressed the intention would have been to state that as the amount intended in the

granting part of the act, instead of stating, as the amount granted, all the swamp-lands lying within the limits.

Following the portions of the act referred to, is the language upon which the doubt arises, as follows: "And if, upon the completion of any twenty continuous miles of said road, as aforesaid, it shall be found that within the said seven miles of said line there shall not be an amount of swamp-lands on each side of said line, belonging to the state, equal to at least seven full sections per mile of said road so completed, then the said company shall have the right to and may select, from the swamp-lands belonging to this state outside of said seven-mile limits, other swamp-lands in an amount equal to such deficiency." This is in the nature of a guaranty or undertaking on the part of the state that the swamp-lands designated in the granting part of the act, to wit, all the swamp-lands lying within the prescribed limits, shall be at least equal to a certain amount—that is, the state, having made a grant of all the swamp-lands, whatever the amount might be, within those limits, such amount being unknown, in order to induce the company to accept the grant and build the road, undertakes that if the quantities or amounts in the several subdivisions surveyed as swamp-lands, added together, do not equal a given number of full sections, it will make up the deficiency from its swamp-lands outside of the limits.

The defendants claim that the number of full sections intended for the entire line is seven per mile, or equal to one-half of all the land lying within the strip; the plaintiff claims that it is fourteen, or equal to the whole of the lands within the strip. And it may be remarked again, as to this part of the act, that, had it been the intention to make up fourteen full sections per mile, the easiest, shortest and most obvious mode of expressing the intention would have been by using the word fourteen instead of the word seven.

The words, "on each side of said line," certainly indicate that the amount named in this part of the act—to wit, seven full sections per mile—is to apply to the half of the strip on

each side of the line, and not to the entire strip.  On the other hand, the words, "equal to at least seven full sections per mile," imply that within the space intended by the legislature there may be found to be more or less than the designated amount.  There might be more than that amount of swamp-lands in the entire strip of fourteen miles wide; there could not by any possibility be more than that amount, and there was no probability that there would be as much as that amount, within each half of the fourteen mile strip.  To make the sentence, standing by itself, clear and consistent, it is necessary to either change the position in it of the words "each side," or reject from it entirely the words "at least."  As the grant is not in terms of fourteen sections per mile, nor of swamp-lands equivalent in amount to all lands lying within the strip of fourteen miles wide, but of all swamp-lands within the strip, with an undertaking to make up to the company so much as such swamp-lands should be found to fall short of a given amount in full sections, we think the words "at least" have an important place in the sentence, and ought not to be rejected from it.  Putting it most favorably for the plaintiff, it is doubtful whether the act intends to give it seven or fourteen sections per mile, and within the rule that nothing will pass by legislative grant except what is clearly and manifestly intended by the legislature, the doubt requires a construction against the claim of the company.  The grant is equivalent to a grant of seven full sections per mile, and no more.

The order appealed from, so far as it sustains the demurrer of the defendant Davis, is affirmed.  So far as it sustains the demurrer of the other defendants, it is reversed, but without costs.